
FILED
Mar 31 2015, 10:47 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS

Louis F. Britton
Charles H. Ray
Cox, Zwerner, Gambill, &
Sullivan, LLP
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE

John C. Duffey
Heather L. Emenhiser
Stuart & Branigin, LLP
Lafayette, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Berthal O. Williams and
Patricia Williams,

*Appellants-Plaintiffs,*

v.

The Indiana Rail Road
Company,

*Appellee-Defendant*

March 31, 2015

Court of Appeals Cause No.
77A04-1311-CC-580

Appeal from the Sullivan Circuit
Court

Lower Court Cause No.
77C01-1206-CC-332

The Honorable P.J. Pierson, Judge

**Pyle, Judge.**

## Statement of the Case

This appeal involves an "indenture" or agreement—dating back to 1901—between property owners and a railroad company. The indenture gave the railroad company a right to build and maintain a dam and the resulting

accumulation of water on the landowners' property at a depth of fourteen to twenty feet so that the railroad could use it for railroad purposes. More than 100 years later, subsequent property owners—Berthal O. Williams ("Berthal") and Patricia Williams ("Patricia") (collectively "the Williamses")—attempted to enforce that indenture with a subsequent railroad—the Indiana Rail Road Company ("IRR")—and argued that IRR had breached the indenture. IRR moved for summary judgment, arguing that: (1) the 1901 indenture between the original parties was merely a personal obligation and not a covenant that ran with the land; (2) even if it was, the express terms of the indenture did not impose a duty on it to maintain the pond at a specified depth; and (3) even if the indenture so required maintenance of a specific pond depth, the Williamses could not enforce it against IRR because any alleged breach occurred before the Williamses purchased the property, causing any such covenant to cease running with the land. The trial court summarily granted IRR's summary judgment motion.

[2] The Williamses now appeal that order and argue that the trial court erred by granting summary judgment to IRR because none of IRR's proposed arguments support that judgment. Because we conclude that the indenture was a covenant running with the land, that the terms set forth in the indenture required IRR to maintain the dam and the water level at a specified depth, and that the indenture contained a covenant, perpetual in nature, that did not cease upon a prior breach, we conclude that the trial court prematurely granted summary

judgment. Accordingly, we reverse the trial court's judgment and remand for further proceedings.

[3] We reverse and remand.

## Issue

[4] Whether the trial court erred by granting IRR's motion for summary judgment.

## Facts

[5] In 1899, in a handwritten instrument, Lucy and Constantine Stewart ("the Stewarts") conveyed a "perpetual" right-of-way over their land in Sullivan County to Southern Indiana Railway Company ("Southern") for "railway purposes." (App. 38). This right-of-way was granted to Southern and "its successors and assigns[.]" (App. 38). The instrument conveying the right-of-way was recorded that same day.

[6] Two years later, in April 1901, the Stewarts, along with another couple,[1] entered into an "Indenture" with Southern.[2] The Indenture provided:

> THIS INDENTURE MADE AND ENTERED INTO this 27th day of April in, 1901, by and between the Southern Indiana Railway Company, party of the first part, and Constantine W.

---

[1] The other couple that entered into the Indenture were John W. Boston and Sarah A. Boston (collectively, "the Bostons"). For simplicity, we will refer to the Stewarts and the Bostons collectively as "the Stewarts" when discussing the original landowners in this Indenture.

[2] An indenture is a "formal written instrument made by two or more parties with different interests, traditionally having the edges serrated, or indented, in a zigzag fashion to reduce the possibility of forgery and to distinguish it from a deed poll." BLACK'S LAW DICTIONARY 887 (10th ed. 2014).

Stewart and Lucy A. Stewart, husband and wife, and John W. Boston and Sarah A. Boston, husband and wife, parties of the second part, WITNESSETH:

That Whereas the said Constantine W. Stewart and wife and John W. Boston and wife, of the said parties of the second part are the owners of the following described real estate situate[d] in the County of Sullivan, State of Indiana, to-wit:

The South East Quarter (1/4) also the North East Quarter (1/4) of the South East Quarter (1/4) of Section One (1) Township Nine (9) North of Range Eight (8) West.

And [w]hereas the said party of the first part [Southern] is the owner of a right of way running through or adjacent to the said above described lands and whereas the said party of the first part [Southern] is desirous of erecting and constructing and maintaining a dam on its said right of way for the purpose of accumulating a body of water to the end that it may use the same for railway and other purposes, which said dam it desires to erect and construct at or near a railroad bridge on its said right of way through and under which said bridge a stream of water flows and which said stream passes through the above described lands.

Now, [t]herefore, in consideration of the benefits accruing to said owners of said lands and in further consideration of the right which is hereby granted unto said owners of stocking the pond or accumulation of water occasioned by the erection and construction of said dam with game fish, the parties of the first part [Southern] will also assist in stocking [the] pond with fish and the right of said owners and others, by their consent, to take fish from said pond, and the further consideration of the right which is hereby granted to said owners to use said water for farm or other purposes, and the right to cut and use or dispose of ice therefrom, and the right to use said accumulation of water for

boating purposes, the said parties of the second part [the Stewarts and the Bostons] hereby grants [sic] unto the said party of the first part [Southern] the *right to construct and maintain* at or near the bridge aforesaid a dam which shall be not less than fourteen feet or more than twenty feet in height and of sufficient length to properly and effectually dam the water flowing through the said stream *so as to acquire an accumulation of water of a depth of not less than fourteen or more than twenty feet at its deepest point*, and so as to cause an accumulation of water which may cover whatever portion of said above described lands as the said dam so constructed may reasonably cause to be overflowed, except that the overflow shall not cut off access to a strip of land on the north east part of said land, and the said owners of said lands hereby grant unto the said party of the first part [Southern] the *right to maintain* the said *dam* and said *accumulation of water* on said lands, with the further right to use the above described lands for public gatherings and pic-nic purposes, it being understood that the parties of the second part [the Stewarts and the Bostons] in the boating, pic-nic and public gathering purposes hereinbefore granted to them shall have the right of all revenue derived therefrom. It is understood that the said second party [the Stewarts and the Bostons] may, at his option, terminate the right to have pic-nic and public gatherings on said lands.

It is further agreed by the parties hereto that said first part [Southern] shall construct a wife[3] fence around said pond or body of water, within ten feet of the water line of said pond, the fence to be maintained by the first party [Southern].

IN WITNESS WHEREOF, The Southern Indiana Railway Company has caused in duplicate its corporate name to be hereunto subscribed by its President, and its corporate seal to be

---

[3] The Indenture uses the term "wife," but it may have possibly meant "wire."

affixed and attested by its secretary, this 27th day of April 1901.
And the parties of the second party [the Stewarts] have hereunto
set their hands and seals this 27th day of April 1901.

(App. 39) (emphases added).[4] Thereafter, Southern constructed a dam, Hickory Dam, on its right-of-way. At some later point, Southern also built a water tower and pump adjacent to the dam. The Indenture was later recorded in January 1945.

[7] In November 2005, the Williamses purchased property east of and adjacent to the railroad's right-of-way from Alice Jane Schollaert via a warranty deed.[5] The legal descriptions for the two tracts of land conveyed contained references to the railroad right-of-way as a boundary line for the tracts of land. Additionally, the warranty deed provides that it is "[s]ubject to any and all easements, agreements and restrictions of record." (App. 86).

[8] In May 2006, IRR acquired the railroad, including the right-of-way, through a quit claim deed and easement agreement with Soo Line Railroad Company d/b/a Canadian Pacific Railway. After IRR acquired the right-of-way, it did not use the pond or any water from the pond.

---

[4] We cite to the Indenture that was included in IRR's designated evidence on summary judgment. This Indenture was certified by the Sullivan County Recorder as a true and complete copy. We note that the Indenture attached to the Williamses' amended complaint was not a certified copy and has some misspellings, some words missing from it that are contained in the certified copy, and some words inserted that are not included in the certified copy.

[5] The record before us does not reveal when the Stewarts and the Bostons conveyed their land referenced in the Indenture or how or when Alice Jane Schollaert obtained ownership of the land.

[9] In August 2008, Berthal sent a letter to IRR to notify it that there was a "large sink hole" near the dam and railroad that, in Berthal's opinion, was "undermining the integrity of [IRR's] dam and the overlying rail tracks." (App. 65). In the letter, Berthal opined that the "dangerous condition" of the sink hole would "eventually result [in] a significant surface, subsidence, possibly the washout of the dam, and potentially a catastrophic derailment." (App. 65). Berthal also referenced the Indenture entered into by IRR's and Berthal's "predecessors" as well as the dam and "resulting lake" that were "created under" the 1901 Indenture. Berthal stated that this "agreement provides for certain obligations to maintain the lake" and alleged that these obligations were now IRR's obligations. (App. 65). In his letter, Berthal stated that the overflow water from the dam was "exiting the lake through the sink hole" and that the sink hole had been there since at least 2004. (App. 65).

[10] Approximately two years later, in June 2010, Berthal sent IRR another letter regarding the sink hole and his concerns regarding it. Berthal also stated that "the sink hole is allowing the water level of the lake to fall 1 to 2 feet below an overflow device installed by Canadian Pacific Railway in 2004" and "to a level significantly below the level which the Railroad is required to maintain[.]" (App. 67). Berthal also stated that, pursuant to the Indenture, IRR was required to "maintain an accumulation of water of a depth of not less than 14 nor more than 20 feet at its deepest point in the pool of the lake created by the dam." (App. 67).

On June 4, 2012, the Williamses filed a complaint against IRR and then filed an amended complaint on November 5, 2012. In their amended complaint, the Williamses—citing to the Indenture entered by their "predecessor-in-interest" and IRR's "predecessor-in-interest"— asserted that "[i]n consideration for permitting Southern to construct the dam and create and use the pond upon the Real Estate, Southern agreed, among other things, to maintain the dam and pond once constructed in accordance with the requirements specified in the Indentured Agreement." (App. 16). Thus, the Williamses alleged that IRR, as successor to Southern, was required but had "refuse[d]" to maintain the dam and the pond as specified in the Indenture between the parties' predecessors-in-interest. (App. 17). They sought "an injunction and judgment against [IRR] to repair the dam and to bring the pond into compliance with the requirements of the Indentured Agreement[.]" (App. 17). In other words, the Williamses sought to have the trial court order IRR to maintain the pond on the Williamses' property so that it would be at a depth of at least fourteen feet. Additionally, they sought damages "in an amount sufficient to compensate [them] for their loss[.]" (App. 17).

Thereafter, IRR filed a motion for summary judgment, arguing that: (1) the 1901 Indenture between the original parties was not a covenant that ran with the land; (2) even if it was, the express terms of the Indenture did not impose a duty on IRR to maintain the pond at a specified depth; and (3) even if the Indenture so required, the Williamses could not enforce the Indenture against

IRR because any alleged breach occurred before the Williamses purchased the property, causing any such covenant to cease running with the land.

[13] In its designated evidence, IRR included an affidavit from Jennifer Born ("Born"), an historian who served as a consultant for IRR to conduct research about the railroad in Indiana, wrote a book about the history of Indiana railroads, and assisted IRR in the organization of its historic archives. In her affidavit, Born explained the history of steam engines and the importance of railroads being able to use or acquire a water source to power its steam engines. She explained that in 1901—when the Indenture was entered—railroads operating in Indiana, including Southern, used locomotives powered by steam. Born further explained that in order to obtain water sources for their steam locomotive, railroads frequently entered into agreements with landowners to obtain water from an existing water source or to create a pool of water from which they could take water. She attested that the Indenture was "consistent with the agreements railroads entered into with property owners to provide a water source for their locomotives." (App. 60). Finally, she explained that by the late 1930's, railroads in Indiana began using diesel engines and that they had not used steam engines since 1954. She also attested that Southern's water tower and pump, which would have been used to "siphon and hold water from the pond[,]" had not been used since 1954. (App. 61).

[14] IRR also included an affidavit from its vice-president of engineering, Peter Ray ("Ray"), who attested that IRR had not used the pond or any water from the pond since it acquired the railroad right-of-way in 2006. Ray also attested that

the dam was "structurally sound and [was] periodically inspected and maintained by [IRR] in accordance with the requirements set forth in 49 C.F.R. Part 213." (App. 64). Additionally, Ray attested that the "trackage and right-of-way (the 'dam') [were] periodically inspected" by the FRA [Federal Railroad Administration] for compliance with 49 C.F.R. Part 213 ("Track Safety Standards)" and that this inspecting agency had "not taken any exceptions to the maintenance and condition of this trackage and right-of-way." (App. 64).

[15] Thereafter, the Williamses filed a response to IRR's summary judgment motion as well as a cross-motion for summary judgment. As part of its cross-motion, the Williamses argued that IRR breached the Indenture by refusing to maintain the dam and by causing the pond's water level to go below fourteen feet. The Williamses also argued that the Indenture was a covenant that ran with the land.

[16] In response to IRR's summary judgment motion, the Williamses argued that the Indenture did impose a duty on IRR to maintain the pond at a specified depth. They also acknowledged that the Indenture referred to a "right" to maintain the dam and pond but argued that it was in reference to a property right that was not previously conveyed in the railroad right-of-way. The Williamses also argued that any breach of the Indenture that occurred before their purchase of the property did not preclude the covenant imposed in the Indenture from running with the land because the breach was not a "total" breach and was, instead, a continuous breach with the damages continuing to accrue. The Williamses contended that IRR had "no right to cease to maintain

the dam and pond simply because [it] claim[s] [it] no longer ha[s] a use for the water from the pond." (App. 83-84).

[17] As part of their designated evidence, the Williamses included an affidavit from Berthal, who attested that the "dam [was] in a state of disrepair" and that "the pond at its deepest point [was] approximately 5 feet deep." (App. 88). He also attested that, as he understood the Indenture, "the owner of the railroad right-of-way that crosses the property [was] require[d] to repair the dam so that the pond d[id] not drop below 14 feet at its deepest level." (App. 88). As for damages, Berthal attested that "[t]he slow draining of the pond has caused damage to the [Williamses'] property and continues to cause damage" and that their "property's value without the pond [was] significantly lower than with the pond." (App. 89). They contended that if the pond were to become completely drained, then there would be a total breach.

[18] When IRR filed its summary judgment reply and response to the Williamses' cross-motion for summary judgment, it moved to strike, in part, Berthal's affidavit.[6] IRR also included additional designated evidence in the form of a supplemental affidavit from Ray. In this affidavit, Ray attested that the pond on the Williamses' property was "principally fed by [rain] water runoff" and "not fed by a natural water course, such as a stream or river[,]" and [a]s a result, silt (mud) probably ha[d] accumulated on the bottom of the pond over many

---

[6] IRR moved to strike parts of paragraphs five and seven of Berthal's affidavit.

years" and was therefore "at least one factor in the water depth of the pond at a level of less than fourteen feet." (App. 108).

[19] Subsequently, the Williamses filed their summary judgment reply. They argued, in relevant part, that the covenant was still enforceable despite a breach prior to their ownership of the property, arguing that the breach continued and was not a total breach. The Williamses included a supplemental affidavit from Berthal, who attested that his "opinion" was that "the value of the property decreases as the pond level decreases, with the ultimate damage being a decrease in the property's value of $200,000 if the pond is to become completely drained." (Appellee's App. 18). The Williamses also filed a motion to strike Ray's supplemental affidavit.[7] Thereafter, IRR moved to strike, in part, Berthal's supplemental affidavit.[8]

[20] After holding a hearing, the trial court issued an order in which it summarily granted IRR's summary judgment motion. The trial court also granted IRR's motion to strike, in part, Berthal's supplemental affidavit and denied the Williamses' motion to strike Ray's supplemental affidavit. The trial court made no ruling on IRR's motion to strike, in part, Berthal's affidavit. On appeal, the Williamses do not challenge the trial court's rulings on these motions to strike.

---

[7] The Williamses moved to strike paragraphs six and seven of Ray's supplemental affidavit.

[8] IRR moved to strike paragraphs six through 8 of Berthal's supplemental affidavit and Exhibit A-3 attached thereto.

The Williamses now appeal the trial court's order granting IRR's motion for summary judgment.[9]

# Decision

The Williamses contend that the trial court erred by granting IRR's motion for summary judgment.

When reviewing a trial court's order granting summary judgment, we apply the same standard as that used in the trial court. *Kopczynski v. Barger*, 887 N.E.2d 928, 930 (Ind. 2008). Summary judgment is appropriate only where the designated evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ind. Trial Rule 56(C). The moving party "bears the initial burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law." *Gill v. Evansville Sheet Metal Works, Inc.*, 970 N.E.2d 633, 637 (Ind. 2012). If the moving party meets this burden, then the non-moving party must designate evidence demonstrating a genuine issue of material fact. *Id.* "[A]n adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." T.R. 56(E). When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of

---

[9] The Williamses do not appeal the trial court's denial of their cross-motion for summary judgment.

the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Dible v. City of Lafayette*, 713 N.E.2d 269, 272 (Ind. 1999). "Just as the trial court does, we resolve all questions and view all evidence in the light most favorable to the non-moving party, so as to not improperly deny him his day in court." *Alldredge v. Good Samaritan Home, Inc.*, 9 N.E.3d 1257, 1259 (Ind. 2014) (internal citations omitted).

[23] The issue in this summary judgment involves contract interpretation, specifically the application and meaning of the Indenture that was entered in 1901 between parties—Southern and the Stewarts—who are not parties to this dispute or appeal. The crux of this appeal is whether that Indenture imposed an obligation on IRR, as a successor to Southern, to maintain the depth of the pond at a level no less than fourteen feet. "Summary judgment is especially appropriate in the context of contract interpretation because the construction of a written contract is a question of law." *TW Gen. Contracting Servs., Inc. v. First Farmers Bank & Trust*, 904 N.E.2d 1285, 1287–88 (Ind. Ct. App. 2009) (citing *Colonial Penn Ins. Co v. Guzorek*, 690 N.E.2d 664, 667 (Ind. 1997)), *reh'g denied*. "The ultimate goal of any contract interpretation is to determine the intent of the parties when they made the agreement." *Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012), *reh'g denied.* To do so, "we begin with the plain language of the contract, reading it in context and, whenever possible, construing it so as to render each word, phrase, and term meaningful, unambiguous, and harmonious with the whole." *Id.* A court should construe

the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless. *Hammerstone v. Ind. Ins. Co.*, 986 N.E.2d 841, 846 (Ind. Ct. App. 2013).

[24]     Here, the Williamses filed their complaint against IRR, arguing that IRR had breached the Indenture by failing to comply with its obligation—imposed under the Indenture that had been entered into by Southern and the Stewarts in 1901—to maintain the dam and the pond depth. The Williamses argued that, as a result of that breach of the Indenture, they were entitled to injunctive relief and damages.

[25]     When IRR filed its motion for summary judgment, it set forth three arguments as to why it believed the Williamses were not entitled to the relief requested. The trial court granted summary judgment to IRR by entering a general judgment and did not enter any specific findings regarding which of IRR's arguments it had relied upon to grant the summary judgment motion.

[26]     On appeal, the Williamses argue that the trial court's general judgment granting IRR's motion for summary judgment cannot be affirmed because all the theories argued by IRR do not support a grant of summary judgment in IRR's favor. Specifically, the Williamses argue that: (1) the Indenture was a covenant that ran with the land and, thus, applicable to the parties; (2) the Indenture imposed an obligation or duty on IRR to maintain the dam so that the pond depth did not fall below fourteen feet; and (3) any breach of the covenant in the Indenture that may have occurred before the Williamses' purchase did not

preclude it from continuing to run with the land.[10]  We will review each argument in turn.

### 1.  Applicability of Indenture – Covenant Running with the Land

[27]  The first summary judgment argument set forth by IRR that is now challenged by the Williamses is whether the Indenture was a covenant running with the land and, thus, applicable to the parties on appeal.

[28]  Neither the Williamses nor IRR were a party to the Indenture.  The "obligations of a contract are ordinarily limited to the parties by whom they are made, and those who stand in privity with them, either in estate or contract." *Evansville & S.I. Traction Co. v. Evansville Belt Ry. Co.*, 44 Ind. App. 155, 162, 87 N.E. 21, 23 (1909).  Privity of estate is an exception to the privity of contract requirement.  *Columbia Club, Inc. v. Am. Fletcher Realty Corp.*, 720 N.E.2d 411, 417 (Ind. Ct. App. 1999), *trans. denied*.  A "[p]rivity of estate that can render parties liable upon contracts not of their own making relate solely to covenants that run with land, or some interest therein." *Evansville*, 87 N.E. at 24.  "Thus, the law of contracts and property may both be implicated in a breach of contract action, especially when a contract concerns promises in instruments

---

[10] The Williamses also argue that there was a genuine issue of fact regarding whether the dissipation of the water depth of the pond was caused by IRR's alleged failure to maintain the dam.  IRR made this argument in response to the Williamses' breach of contract argument made in its cross-motion for summary judgment. The Williamses do not appeal the denial of their cross-motion; thus, we will not address this argument.

relating to real estate, which are known as covenants." *Columbia Club*, 720 N.E.2d at 417.

[29] "Generally, covenants are agreements to do, or not to do, a particular act." *Id.* "In modern usage, the term 'covenant' generally describes promises relating to real property that are created in conveyances or other instruments." *Id.* Covenants can be negative, affirmative, or restrictive. *Id.* at 418. Negative covenants prohibit one of the parties from doing some act, whereas affirmative covenants require the covenantor to perform some act. *Id.* Restrictive covenants prohibit one of the parties from using the property in a particular manner. *Id.* Here, the Indenture involved a requirement that the railroad—upon exercising its right to build a dam—maintain the dam and the "accumulation of water" on the landowner's property. (App. 39). Thus, the provisions of the Indenture established an affirmative covenant.

"Land use covenants," such as the one in this case, create rights and duties between the original promising parties, where one party receives a "benefit" and the other party carries a "burden." *Columbia Club*, 720 N.E.2d at 418. These covenants may be either "personal" or may "run with the land." *Id.* A personal covenant "is enforceable only by the original parties to an agreement." *Id.* On the other hand, a covenant that runs with the land, also called a "real covenant," *id.*, can be enforced "by or against those who have succeeded to an estate in real property to which the covenant relates." *Keene v. Elkhart Cnty. Park & Recreation Bd.*, 740 N.E.2d 893, 896 (Ind. Ct. App. 2000), *reh'g denied*. *See also* BLACK'S LAW DICTIONARY 445 (10th ed. 2014) (defining a covenant

running with the land as a "covenant intimately and inherently involved with the land and therefore binding subsequent owners and successor grantees indefinitely").

[30] Even in the early twentieth century, our Indiana Supreme Court noted that "[i]t is not always easy to mark the distinction between those covenants which are personal and those which run with the land." *Millikan v. Hunter*, 180 Ind. 149, 100 N.E. 1041, 1042-43 (1913).

> When an instrument conveys an interest or right in land, and at the same time contains a covenant in which a right attached to the estate or interest granted is reserved, or when the grantee covenants that he will do some act on the estate, or interest granted, which will be beneficial to the grantor, either as respects his remaining interest in the land, out of which an interest is granted, or land adjacent thereto, such covenant is one which may be annexed to and run with the land and bind its owners successively. When such grant is made, and contains a covenant so expressed as to show that it was reasonably the intent that it should be continuing, it will be construed as a covenant running with the land.

*Id.* (quoting *Conduitt v. Ross*, 102 Ind. 166, 26 N.E. 198 (1885)) (internal quotation marks omitted).

[31] More recently, we have explained that a covenant imposing an affirmative burden will run with the land if: "(1) the covenantor and covenantee intend it to run; (2) the covenant touches and concerns the land; and (3) there is privity of estate between subsequent grantees of the covenantor and covenantee."

*Columbia Club*, 720 N.E.2d at 418 (citing *Moseley v. Bishop*, 470 N.E.2d 773, 776 (Ind. Ct. App. 1984)).

[32] At the summary judgment level and on appeal, IRR concedes that the covenant at issue in the Indenture touches and concerns the land and that there is privity of estate between the relevant parties. Thus, the parties dispute only whether the original covenanting parties intended the covenant to run with the land. Therefore, we must determine "whether the covenanting parties objectively intended the covenant to be enforceable against remote grantees to the land." *Id.*

[33] "The covenanting parties' intent must be determined from the specific language used and from the situation of the parties when the covenant was made." *Id.* at 419. "[N]o particular language is required to demonstrate an intent to run with the land." *Id.* "Although a statement in the covenant that it is binding on the covenantor's heirs and assigns is strong evidence of intent that the covenant should run with the land, the omission of such language . . . does not conclusively prove the covenant was not intended to run" with the land. *Moseley*, 470 N.E.2d at 776-77.

[34] Here, the Stewarts, in a written instrument, originally conveyed a perpetual right-of-way easement to Southern for railway purposes. Two years later, again in a written instrument, they conveyed to Southern the right to build a dam on that previously granted right-of-way. The Indenture referred to Southern's interest in the previously conveyed railroad right-of-way and acknowledged that

it was the "owner" of the right-of-way. (App. 39). In regard to the right to construct the dam, the Indenture provided that Southern had the right to construct the dam so as to "dam the water flowing through the . . . stream" that ran through the Stewarts' land and to "acquire an accumulation of water" (or pond) on their land that Southern could use for railway purposes. *Id.* In essence, the Stewarts conveyed Southern an affirmative easement.[11] In exchange for this right to dam the stream and create an accumulation of water (as well as the right to use the pond for gathering and picnic purposes), Southern agreed to maintain the dam and the resulting accumulation of water at a specified depth—a minimum of fourteen feet and a maximum of twenty feet. In consideration for granting these rights to the railroad, the Stewarts obtained the benefit of an accumulation of water that it too could use for farming and various recreational purposes.

[35]   While the Indenture does not contain an express statement of intent, it does provide that the railroad agreed to "maintain" the dam and resulting pond. We have previously explained that "maintain" means "'to hold or keep in any particular state or condition, esp. in a state of efficiency or validity; to support, sustain, or uphold; to keep up; not to suffer to fail or decline.'" *Keene*, 740 N.E.2d at 897 (quoting WEBSTER'S NEW INTERNATIONAL DICTIONARY (2nd ed. 1934)). Additionally, our Indiana Supreme Court explained that the use of

---

[11] An "affirmative easement" is "[a]n easement that forces the servient-estate owner to permit certain actions by the easement holder, such as discharging water onto the servient estate." BLACK'S LAW DICTIONARY 622 (10th ed. 2014).

the word "maintain[]" in a covenant signals that the parties intended a covenant to be a continuing one because such word was one of "projection into the future." *Millikan*, 100 N.E. at 1042. Furthermore, the language of the Indenture provides that the railroad "shall" build a fence around the "pond or body of water" and maintain that fence, which further points to an intent that the parties intended the covenant to run with the land. (App. 39). *See Midland R. Co. v. Fisher*, 125 Ind. 19, 24 N.E. 756, 757 (1890) (concluding that an agreement to erect and maintain fence was a covenant running with the land); *Stover v. Harlan*, 87 Ind. App. 347, 154 N.E. 882, 883 (1927) (holding that an agreement to erect and maintain fence was a covenant running with the land). The covenant to maintain the dam and pond depth was part of a conveyance of the right to build the dam on the railroad right-of-way. Maintaining the accumulation of water in the pond at a depth of at least fourteen feet directly concerns the land and the right to build and maintain the dam. It is not merely a personal covenant concerning something collateral to the land. Based on the specific language used, we determine that the original parties' intent was for the covenant in the Indenture to run with the land. *See, e.g.*, *Keene*, 740 N.E.2d at 895 (holding that a covenant, which was in a 1924 deed, to "construct and forever maintain a proper bridge" over a canal and that would "provide safe and secure crossing over said canal for all farming operations" was a covenant running with the land); *see also Terry Weisheit Rental Properties, LLC v. David Grace, LLC*, 12 N.E.3d 930, 938 (Ind. Ct. App. 2014) (explaining that intent for a covenant to run with the land can exist even though the deed does not contain an express statement of intent), *reh'g denied*.

[36]     Furthermore, the situation of the parties at the time the covenant was made also leads to a determination that the parties intended the Indenture to run with the land. IRR's designated evidence shows that when the Indenture was made in 1901, Southern and other railroads were using steam engines that required a water source and that these railroads frequently entered into agreements with landowners in order to obtain a water source for those steam engines. Additionally, this designated evidence indicates that the water from the pond at issue was indeed used for the railroad's steam engines. IRR's designated evidence further reveals that the railroad used steam engines (and, thus, the water in the pond) for more than four decades after the Indenture was entered. Although railroads now use diesel engines instead of steam engines, the designated evidence does not reveal that there was knowledge in 1901 that steam engines were on the way out or that the water would no longer be needed such that the parties would have intended for the covenant not to run with the land.

[37]     We acknowledge that IRR presented designated evidence indicating that they have not used the water from the pond for railway purposes since 1954 when they completely ceased using steam engines. While IRR may not be using the water accumulated from the dam, there appears to be no dispute that the dam is still present and that it is required to maintain it. Indeed, IRR's designated evidence shows that they continue to inspect and maintain the dam pursuant to federal regulations. Thus, they appear to acknowledge that this requirement to

maintain the dam ran with the land because Southern exercised its right to build the dam.

[38] Because the facts surrounding the Indenture and the language used suggest that the parties intended the covenant to run with the land, we conclude that the covenant in the Indenture was one that runs with the land. Thus, if the trial court granted summary judgment to IRR based on this theory, it would have been error. *See, e.g.*, *Keene*, 740 N.E.2d at 899 (holding that remote grantee was bound by covenant running with the land despite the fact that the remote grantee did not enjoy the same significant benefit as the original grantee); *Columbia Club*, 720 N.E.2d at 420 (noting that given the importance of the covenant, it was "improbable" that the parties intended it to be purely personal and not binding on subsequent grantees); *Mosely*, 470 N.E.2d at 777-79 (holding that an 1896 agreement regarding installing and "permanently maintain[ing]" drain tile was held to be a covenant running with the land and imposing an obligation on a remote grantee to maintain and replace the tile); *Pittsburgh, Cincinnati, Chicago & St. L. Ry. Co. v. Wilson*, 34 Ind. App. 324, 72 N.E. 666, 667-68 (1904) (holding that a railroad, which was subject to a real covenant to make and maintain a farm crossing over the railroad's line of track that divided a landowner's farm, was obligated to rebuild the crossing for the landowner after the original crossing was destroyed).

## 2. Obligation under the Indenture – Requirement to Maintain Pond Depth

[39] We next turn to IRR's second argument set forth on summary judgment, which challenged its obligation under the Indenture. IRR argued that even if the

Indenture did indeed run with the land, it did not impose an obligation or duty on it to maintain the pond at a depth of at least fourteen feet. The language of the Indenture provided, in part, that the Stewarts "grant[ed]" Southern "the right to construct and maintain . . . a dam" and "the right to maintain the said dam and said accumulation of water" on their land. (App. 39). IRR contended that the Indenture merely afforded it the "right" to maintain the pond depth between fourteen and twenty feet but that it did not require it to do so. To support its argument, IRR relied upon this Court's opinion in *Erwin v. HSBC Mortgage Srvs., Inc.*, 983 N.E.2d 174 (Ind. Ct. App. 2013), *trans. denied*.

[40] On appeal, the Williamses contend that the "intent [wa]s for Southern, and its successors, to maintain the dam so that the pond d[id] not fall below fourteen feet in depth." (Williamses' Br. 10). They further assert that if the original parties did not intend for Southern and its successors to have such a duty or obligation then they would not have included specific language regarding the minimum and maximum depth of the water that the dam accumulated. They argue that IRR's argument would render meaningless the language regarding the specific depth of the pond. They also assert that when the Indenture makes reference to the right to construct and maintain a dam, "it is referencing a property right that was not previously conveyed to Southern in the original right-of-way." (Williamses' Br. 11).

[41] The arguments presented requires us to interpret the Indenture, which is a question of law. "The primary purpose in the construction of contracts is to ascertain and give effect to the mutual intentions of the parties." *Hutchinson,*

*Shockey, Erley & Co. v. Evansville-Vanderburgh Cnty. Bldg. Auth.*, 644 N.E.2d 1228, 1231 (Ind. 1994), *reh'g denied*. "[S]pecific words and phrases cannot be read exclusive of other contractual provisions." *Columbia Club*, 720 N.E.2d at 419. "We read the language of a real covenant in the ordinary and popular sense, and not in a technical or legal sense." *Keene*, 740 N.E.2d at 897. "We presume that the parties intended for every part of a deed to have some meaning, and we favor a construction that reconciles and harmonizes the entire deed." *Id.*

[42]   As discussed above, the language of the Indenture reveals that when the Stewarts granted Southern the "right to construct and maintain" the dam, they also effectively conveyed an affirmative easement, allowing Southern to cause an "accumulation of water" on their land as a result of Southern's damming of the stream. (App. 39). The parties included specific language providing that this accumulation of water would be "of a depth of not less than fourteen or more than twenty feet at its deepest point[.]" *Id.* Thus, the Indenture does contain a requirement regarding maintenance of the pond between a certain depth range.

[43]   Furthermore, we do not find IRR's reliance on this Court's opinion in *Erwin* to be dispositive. In that case, we distinguished between a duty and a right in the context of a negligence case. *Erwin*, 983 N.E.2d at 180-81. After a child drowned in a pool of a landowner who had abandoned his house when he filed bankruptcy, the child's parents filed a negligence claim against various parties, including the homeowner association ("HOA") and its management company. *Id.* at 176-78. The HOA and management company filed a motion for

summary judgment, alleging that they owed no duty to the child, and the trial court granted their motion. *Id.* at 178.

[44] On appeal, the plaintiff argued that the HOA's and management company's duty to protect the child arose from the HOA's declaration of covenants document, which provided that the HOA had a "right" to enforce the covenants therein. *Id.* at 180. We disagreed and explained that the document provided a "general right of enforcement" but did "not impose a duty or obligation" on the HOA or management company to exercise that right. *Id.*

[45] We find *Erwin* to be distinguishable. That case involved the analysis of the existence of a duty in a negligence case; whereas, this case deals with a breach of covenant involving real property. Under the language used in the Indenture, the railroad was granted a right to construct the dam that would result in an accumulation of water on the landowners' property. Unlike the right in *Erwin*, here, the railroad exercised its right to construct the dam that would result in an accumulation of water on the landowners' property. Once it exercised that right, the language in the Indenture required it to "maintain" the dam and resulting accumulation of water at the depth range specified by the parties—a minimum of fourteen feet and a maximum of twenty feet.

[46] Accordingly, we conclude that the Indenture—which we held was a covenant running with the land—does contain a requirement regarding maintaining the depth of the pond or accumulation of water on the Williamses' land. "[O]ne who takes real property subject to covenants running with land set forth in a

deed is bound by those covenant as if he were a party to the original transaction." *Keene*, 740 N.E.2d at 899. We, however, make no determination regarding whether IRR has or has not complied with the requirement contained in the Indenture. We merely hold that, if the trial court granted summary judgment to IRR based on the theory that the Indenture contains no requirement regarding water depth, then it would have been error.

### 3. Ability to Seek Relief under the Indenture – Continuation of Covenant

[47] Lastly, we address the Williamses challenge to IRR's third summary judgment argument, which challenged the Williamses' ability to seek relief for any breach of the Indenture.

[48] IRR argued at the summary judgment level, and continues to do so on appeal, that the letters that it received from Berthal in 2008 and 2010—and then included as designated evidence—show that any breach of the Indenture occurred in 2004, which was one year before the Williamses purchased the property. IRR argued that—even assuming the Indenture was a covenant that ran with the land and contained a requirement regarding the maintenance of the pond at a particular depth—the covenant in the Indenture ceased to run with the land when it was breached prior to the Williamses' purchase of the property. In support of its argument, IRR cited to *Junction Ry. Co. v. Sayers*, 28 Ind. 318 (1867). IRR also cites to the Indiana Law Encyclopedia for the proposition that "a covenant when broken ceases to run with the land." 8 INDIANA LAW ENCYCLOPEDIA, Covenants § 9 (2013) (citing *Moseley*, 470 N.E.2d 773).

[49] The Williamses argue that if the trial court relied upon IRR's argument to grant its summary judgment motion, then the trial court erred. They argue, in part, that IRR's reliance on *Junction Railway* is not controlling because any breach that may have occurred prior to their purchase was not a "total" breach in which all the damages accrued to the prior owner. Instead, they contend that the breach was continuous—as the depth of the pond continues to dissipate— and they allege that they have suffered damages in the form of the decreased value of their property. In support of their argument, they cite to *Martin v. Baker*, 5 Blackf. 232 (Ind. 1839) and other nineteenth century cases dealing with the covenant of seisin.[12]

[50] First, turning to IRR's reliance on the Indiana Law Encyclopedia ("ILE"), we find it to be misplaced. The sentence cited by IRR is from the section of the ILE dealing with the duration of a covenant. The full paragraph from which the quoted phrase comes provides as follows:

> A real covenant generally survives as long as the estate with which it runs, absent some indication that the original covenantors intended to limit its duration. Furthermore, a covenant when broken ceases to run with the land. However, covenants may be perpetual, and a perpetual maintenance

---

[12] A covenant of seisin is a "covenant, usu. appearing in a warranty deed, stating that the grantor has an estate, or the right to convey an estate, of the quality and size that the grantor purports to convey." BLACK'S LAW DICTIONARY 445 (10th ed. 2014).

> obligation in a real covenant may include the obligation to rebuild as well as to repair.

8 INDIANA LAW ENCYCLOPEDIA, Covenants § 9 (footnotes omitted). While this secondary source indicates that a covenant will cease to run with the land upon a breach, the case upon which it relies does not so hold. *See Moseley*, 470 N.E.2d at 773-80. Instead, given the nature of the covenant made—to maintain the dam and accumulating water between fourteen and twenty feet—and the lack of language regarding a limitation to the covenant, we conclude that it is more of a continuing or perpetual covenant as long as the dam or the covenant is still in existence. We have explained that "[a]n agreement in which the time of performance is not otherwise limited is presumed to continue for a reasonable time" and that "absent some indication that the original covenantors intended to limit its duration, a real covenant generally survives as long as the estate with which it runs." *Moseley*, 470 N.E.2d at 779 (citations omitted). Such a continuing covenant has the potential of being breached on more than one occasion, especially where the breach has been cured. Thus, any breach that may have occurred prior to the Williamses' purchase of the property did not necessarily terminate the covenant or preclude it from running with the land. *See The Winterton, LLC v. Winterton Investors, LLC*, 900 N.E.2d 754, 763 (Ind. Ct. App. 2009) (noting the difference between a breach of contract and termination of a contract and explaining that generally the parties' obligations or duties under a contract end only when a contract is terminated and not with a breach), *trans. denied*.

Furthermore, we conclude that IRR's reliance on *Junction Railway* is also misplaced. In *Junction Railway*, a railroad and a landowner, Hamilton, entered into a verbal agreement in 1853 that the railroad could change the course of a stream of water on Hamilton's land (which was used to propel two mills) upon the condition that the railroad would provide a new channel for the redirected water. *Junction Ry. Co.*, 28 Ind. at 318-19. The agreement called for the railroad to cut the new channel to a depth that would preserve and maintain the dam in the mills so as to keep the water therein at a specified level and at a width that was wide enough to carry off the water from the stream. *Id.* at 319. The railroad also agreed to erect and maintain a levee high and strong enough to protect the mills from water damage. *Id.* Hamilton subsequently conveyed the real estate to Sayers in 1855. *Id.* Thereafter, the land and mills were flooded and damaged after heavy rains in 1865. *Id.* at 319-20. Sayers brought suit against the railroad, claiming that the railroad did not comply with its agreement with Hamilton because it had cut the channel so narrow that it did not carry off surplus water and had not built or maintained a levee strong enough to prevent water from damaging the mills and land. *Id.* at 320.

On appeal, the railroad challenged the trial court's overruling of a demurrer to Sayer's complaint. When reversing the trial court's judgment, our Indiana Supreme Court stated:

> It appears by the averments of the complaint, that the agreement to construct a new channel of proper depth and width, and a levee of sufficient strength, was broken by the appellant while the property was still owned by *Hamilton,* and we do not think that

the subsequent sale of the property to the appellees transferred to them any right of action for the violation of the agreement. If the verbal agreement to make and maintain the channel could be regarded as a covenant, yet, the breach having occurred before the purchase by the appellees, they took the land as it was; and if the easement of the appellant in the land proves an incumbrance to the estate, the relief, if any, must be found in an action upon the covenants in the deed conveying the title to them.

In the discussion following the *Spencer's* case, 1 Smith's Lead. Cas., 165, it is said: "The current of *American* authority tends, with but little exception, toward the position that, on total breach, a covenant, though annexed to the realty, becomes a mere personal right, which remains with the covenantee or his executors, and does not descend with the land to heirs, nor run with it on any future assignment to third parties. Where the right of action falls, there it lies." The demurrer to the complaint should have been sustained.

*Id.* (emphasis in original).

[53] We cannot agree with IRR that *Junction Railway* is dispositive and entitled them to summary judgment. First and foremost, the agreement involved in that case was an oral agreement between parties, which does not create a covenant running with the land. *See Bartlett v. State ex rel. Hamilton*, 186 Ind. 16, 114 N.E. 692, 693 (1917) (holding that an oral agreement regarding maintenance of a fence entered between original parties was not a covenant running with the land that bound subsequent grantee); *Hull v. Breedlove*, 89 Ind. App. 460, 165 N.E. 328, 328-29 (1929) (explaining that oral agreement was not a covenant running with the land and not binding on a subsequent purchaser without notice).

Additionally, the breach in that case was one that occurred as soon as the channel was built, failing to comply with the specifications of the verbal agreement.

[54] Here, however, the Indenture or agreement between the parties was set forth in a written instrument that was recorded and involved a covenant that was tied to an easement. The covenant to maintain the dam and the pond within a specified depth range was attached to the affirmative easement allowing the railroad to cause an accumulation of water on the landowners' property. Here, the landowner (the Stewarts) granted a right to the railroad (Southern) to build a dam on its previously granted perpetual railroad right-of-way easement and granted an affirmative easement that allowed the railroad to cause the resulting dammed water to create a pond on the landowner's property. In consideration thereof, the railroad agreed to maintain the dam; maintain the pond at a depth between fourteen and twenty feet; and to build and maintain a fence around the pond. "It is well settled that . . . a covenant in a deed of conveyance of a right of way to a railroad company runs with the land, and is available for the protection of the grantor owning the adjacent land, or his remote grantee, against the railroad company claiming and occupying under such conveyance, whether as the immediate grantee, or as a remote grantee or successor." *Pittsburgh,* 72 N.E. at 667. Furthermore, "[a]n agreement in which the time of performance is not otherwise limited is presumed to continue for a reasonable time[;] [n]evertheless, absent some indication that the original covenantors intended to limit its duration, a real covenant generally survives as long as the

estate with which it runs." *Moseley*, 470 N.E.2d at 779. Thus, we conclude that IRR's argument—that the covenant ceased running with the land upon a possible breach prior to the Williamses' purchase—and its supporting citations do not hold water.

[55] Instead, we conclude that this Court's opinion in *Keene* supports a conclusion that the covenant contained in the Indenture did not cease altogether upon any potential breach that may have occurred in 2004.[13] In *Keene*, Interstate Public Service Company ("IPSCO") purchased a 100-foot wide strip of land from the Darrs so that IPSCO could dig a hydraulic canal through the strip. *Keene*, 740 N.E.2d at 895. The sale of the strip of land caused the Darrs' land to be divided into two separate parcels. *Id.* The 1924 deed between IPSCO and the Darrs provided that, in consideration for the sale of the strip of land, IPSCO agreed to "construct and forever maintain a proper bridge over the canal to be constructed over and above said lands, which bridge shall be one constructed and maintained as to provide safe and secure crossing over said canal for all farming operations upon land now owned" by the Darrs. *Id.* The language of the deed also specified that the covenant was to run with the land. *Id.* Thereafter, IPSCO built the canal and then the bridge over the canal, thus connecting the Darrs' property. *Id.* IPSCO later conveyed the strip of land and canal to Northern Indiana Public Service Company, who then conveyed it to

[13] Because we rely upon this case, we will not address the Williamses' contention that this issue should be decided by relying on cases dealing with the covenant of seisin, which is a covenant of title and different from the covenant at issue.

the Elkhart County Park and Recreation Board ("the Board"). *Id.* The Keenes then acquired the two parcels of land from the Darrs and continued to use them as farm land. *Id.*

[56] In 1996, the Keenes filed suit against the Board, arguing that it had failed to comply with the covenant in the 1924 deed and alleging that the Board had failed in its obligation to construct and maintain a bridge suitable for farming purposes. *Id.* The Keenes requested the trial court to direct the Board to make the necessary repairs, and the Board argued that the Keenes' easement and its obligation to maintain the bridge had been extinguished by a prior action to quiet title to the canal land, which included the strip dividing the Keenes' land. *Id.* at 896. On interlocutory appeal, in an unpublished memorandum decision, another panel of this Court held that the quiet title action neither extinguished the Keenes' easement nor the Board's obligations under the 1924 deed. *Id.*

[57] Thereafter, the Keenes moved for partial summary judgment, arguing that the deed obligated the Board to maintain the bridge so that it would support reasonable modern farming operations. *Id.* The Board, filing its own partial summary judgment motion, argued that it was only obligated to maintain the bridge in a manner that would support farming operations as they existed at the time of the conveyance – thus, in 1924. *Id.* The trial court agreed with the Board, "concluding that the bridge was sufficient in the 1920s, when built, and the original specifications remain the standard for maintenance today." *Id.* (internal quotation marks and citation omitted).

[58] On interlocutory appeal, the Keenes argued that the bridge, originally built by IPSCO, was no longer suitable for modern farming operation, and they asserted the Board was and would be obligated under the original covenant to maintain (and possibly rebuild) the bridge so that it was suitable for modern farming operations. *Id.* at 897. The Board responded that IPCO had discharged its obligation to build the bridge and the only duty left for the Board was to maintain the originally built bridge so that it would accommodate farming operations as they existed at the time of the original deed. *Id.* The Board also argued that even if it was required to maintain the bridge in a manner suitable for current farming operations, the Board would be subjected to a maintenance obligation that would be too uncertain to be enforceable. *Id.* Thus, there was no issue regarding whether the covenant in the 1924 deed ran with the land; the only issue was the Board's current and future obligations, as canal land successor or remote grantee, under the 1924 deed.

[59] We reversed the trial court and held that Board had the obligation to maintain the bridge in a manner that would accommodate modern farming operations. *Id.* at 899-900. We held that the Board was obligated to maintain the bridge, despite the fact that it had not gained a significant benefit from the ownership of the canal lands as compared to IPSCO, who used it for its hydroelectric generation operations. *Id.* at 899. We also explained that

> [c]ovenants should not be interpreted contrary to their underlying purpose and legal effect simply because the interpretation may reduce further litigation or provide better protection to one party. We have previously indicated that the potential expense

associated with fulfilling one's obligation under a real covenant
should not affect a party's obligation to perform . . . The deed
plainly shows that the parties intended that the owner of the
canal lands, currently the Board [as a successor grantee], would
be obligated in perpetuity to furnish a bridge suitable for use in
connection with the farming operations being performed on the
adjacent property.

*Id.* at 900 (internal citations omitted). As for the Board's argument that the maintenance obligation would be too uncertain, we concluded that "the fact that the parties did not agree upon a fixed schedule of maintenance or decide in advance the exact specifications of future improvements d[id] not render the covenant too uncertain to be enforceable." *Id.* at 899. We further concluded that the covenant would "remain sufficiently definite to guide [the parties'] obligations in the future[,]" thus, implying that the covenant that ran with the land that was contained in the original deed would continue in the future despite the Board's current failure to comply with it. *Id.*

Here, as in *Keene*, there is a covenant running with the land that has created obligations on the successor parties. From the language of the Indenture, we conclude that the covenant for maintaining the dam and the resulting accumulation of water is a perpetual or continuing one–as long as the dam or the covenant is in existence—and does not merely cease to exist upon a failure of one of the parties' obligations. Thus, there is the potential that it could be breached on various occasions (as long as any breach was first cured). *See Block v. Ebner*, 54 Ind. 544, 547-48 (1876) (explaining that a continuing covenant, such as a landlord's covenant to repair, may have successive breaches and that

it is not a defense to a suit for the breach of a continuing covenant to allege that there was a former breach of the same covenant). The designated evidence set forth by IRR—the moving party in this summary judgment action—shows that the dam is still in existence, that it continues to maintain the dam, and that it is even reviewed under federal safety guidelines. IRR, as summary judgment movant, did not designate any evidence that it had abandoned its affirmative easement that allowed it to cause an accumulation of water on the Williamses' land. It also did not designate any evidence that it was not aware of its responsibilities under the Indenture.

[62]   IRR's whole argument is premised upon the assumption that a breach of the covenant occurred in 2004, prior to the Williamses' and IRR's ownership of their respective property and associated rights. To support this premise, IRR cites to the two letters that Berthal sent to it in 2008 and 2010, which IRR included in its designated evidence. IRR asserts that these two letters show that the depth of the pond had diminished, which they contend means that there was a breach, at that time, of the covenant to maintain the pond depth.

[63]   The Williamses, however, brought this suit based upon IRR's failure to comply with the covenant in the Indenture, not any breach that may have occurred prior to both parties' relevant property interests. IRR's last argument amounts to a defense to the continued applicability of the Indenture and the obligations contained therein. Therefore, as the moving party in this summary judgment action, IRR was required to show that it had a factually unchallenged affirmative defense that bars the plaintiff's claim. *See Dible*, 713 N.E.2d at 272.

IRR, however, did not designate any evidence to show whether or not any such breach had been cured. If it had been cured (and the water level was then back to a depth between the required fourteen to twenty feet), then the alleged breach at issue could be a subsequent breach or failure to comply with the obligations set forth in the Indenture. This would create a question of fact, making summary judgment inappropriate.

[64] Summary judgment is proper where the movant has shown, through its designated evidence, that there is no genuine issue of as to any material fact and that it is entitled to judgment as a matter of law. Because IRR's last argument contains questions of fact, we conclude that summary judgment would not have been appropriate if based on this argument. Accordingly, we hold that the trial court prematurely granted summary judgment to IRR, and we reverse the trial court's entry of summary judgment in IRR's favor.

[65] We are mindful that, on summary judgment, we are obligated to construe the evidence in favor of the non-moving party and resolve all doubts against the moving party. *Dunaway v. Allstate Ins. Co.*, 813 N.E.2d 376, 384 (Ind. Ct. App. 2004). Even if we believe that the non-moving party will not be successful at trial, summary judgment should not be granted where material facts conflict or conflicting inferences are possible. *Id.*; *see also Hughley v. State*, 15 N.E.3d 1000, 1003-04 (Ind. 2014) (explaining that "summary judgment is not a summary trial" and recognizing that summary judgment is "not appropriate merely because the non-movant appears unlikely to prevail at trial"). Our reversal of the trial court's grant of summary judgment should not be construed as an

opinion on the merits of the Williamses' case or whether they will be able to show that the lowered pond depth was caused by IRR's maintenance of the dam. Nor do we express any opinion whether the Williamses are entitled to their requested injunctive relief and damages. However, because IRR has failed to prove there are no genuine issues of fact regarding its defense to the Williamses' breach of covenant claim against it, we reverse the trial court's entry of summary judgment and remand for further proceedings.

[66] Reversed and remanded.

Friedlander, J., concurs.

Mathias, J., dissents with separate opinion.

| | |
|---|---|
| Berthal O. Williams and Patricia Williams, | Case No. 77A04-1311-CC-580 |
| *Appellants-Plaintiffs,* | |
| v. | |
| The Indiana Rail Road Company, | |
| *Appellee-Defendant.* | |

## Mathias, Judge, dissenting.

I respectfully dissent.

I believe that the resolution of this case is to be found in the plain language of the indenture itself. As the majority recognizes, the indenture grants to the railroad:

> ***the right*** *to construct and maintain . . . a dam* which shall be not less than fourteen feet or more than twenty feet in height and of sufficient length to properly and effectually dam the water flowing through the said stream so as to acquire an accumulation of water of a depth of not less than fourteen or more than twenty feet at its deepest point[.]"

Appellant's App. p. 39 (emphasis added).

This language grants to the railroad the *right* to construct and maintain a dam sufficient to acquire an accumulation of water of a depth not less than fourteen but not more than twenty feet. It imposes no duty or obligation to do so. We previously delineated the difference between a right and a duty or obligation in *Erwin v. HSBC Mortgage Services*, 983 N.E.2d 174 (Ind. Ct. App. 2013), *trans. denied*. Although the majority is correct that *Erwin* was a negligence case, it nevertheless dealt with the interpretation of a covenant of a home-owners association that provided that the association "the right to enforce" the terms of the covenant. *Id*. at 180. We held that this did not equate to a duty or obligation on the part of the association to enforce the terms of the covenant. *Id*.

The same is true here. The indenture at issue gives the railroad the right to build and maintain a dam; it imposes no duty or obligation on the railroad to either build or maintain the dam. Accordingly, I respectfully dissent from the majority's conclusion, and I would affirm the order of the trial court granting summary judgment in favor of the railroad.