**HUTCHINSON, SHOCKEY, ERLEY & CO., Appellant–Defendant,**

v.

**EVANSVILLE–VANDERBURGH COUNTY BUILDING AUTHORITY, Appellee–Defendant,**

and

**The National City Bank of Evansville, Appellee–Plaintiff.**

No. 26S01–9412–CV–1239.

Supreme Court of Indiana.

Dec. 20, 1994.

Rehearing Denied May 17, 1995.

Victor B. Maddox, David Tachau, Michael Q. Murray, Brown, Todd & Heyburn, Louisville, KY, for appellant Hutchinson, Shockey, Erley & Co.

F. Wesley Bowers, David E. Gray, Cedric Hustace, Bowers, Harrison, Kent & Miller, Evansville, for appellee Evansville–Vanderburgh County Building Authority.

David J. Emmert, Indianapolis, for amici curiae Indiana School Boards Ass'n.

J. Christopher White, Indianapolis, for amici curiae Indiana Bankers Ass'n and Peoples Bank & Trust Co.

Jane A. Seigel, Indianapolis, for amici curiae Indiana Ass'n Cities & Towns and Ass'n of Indiana Counties.

Terry E. Harris, Crawfordsville, for amici curiae South Montgomery School Corp.

SULLIVAN, Justice.

We hold that holders of the Bonds issued in 1966 to finance construction of the Evansville Civic Center Complex are not entitled to receive payment before the stated maturity date of their bonds. We therefore grant transfer, vacate the decision of the Court of Appeals, *Hutchinson, Shockey, Erley & Co. v. Evansville–Vanderburgh County Bldg. Auth.* (1993), Ind.App., 626 N.E.2d 551, *reh'g denied,* and affirm the decision of the trial court in this case. Ind.Appellate Rule 11(B)(3).

*Background*

The facts, taken largely from the opinion of the Court of Appeals, are as follows. In May, 1966, the Evansville–Vanderburgh County Building Authority (the "Authority") executed a Trust Indenture with The National City Bank of Evansville as Trustee, governing the sale of $19,250,000 in municipal revenue bonds to finance construction of an Administration and Safety Building, Courts Building and School Corporation Building, known as the Evansville Civic Center Complex. The Authority entered into a 40–year Governmental Buildings Lease ("Lease") with the City of Evansville, the Board of Commissioners of the County of Vanderburgh and the Evansville–Vanderburgh County School Corporation ("Lessees"), beginning on the date the buildings were completed and ready for occupancy. As security for payment of the bonds and interest thereon, the Authority pledged and assigned the fixed annual rentals and other income from the Lease on the buildings to the Trustee.

As is customary with trust indentures of this kind, rental income from the Lease was payable to the Trustee for deposit in a Bond and Interest Sinking Fund pledged to, and to be used solely for the payment of, the interest and principal of the bonds issued under the Indenture. The bonds were scheduled to mature serially each year from 1970 through 2006. They carried interest rates ranging from 1% to 4%. Interest on the bonds is exempt from federal and state taxation.

In 1990, the Authority determined that it had accumulated sufficient revenue in the Sinking Fund to pay the $12,050,000 in principal then outstanding on the bonds at maturity and accrued interest on the bonds when and as interest became due. However, once the Authority had accumulated sufficient funds to pay the bonds to maturity, the Authority anticipated that the State Board of Tax Commissioners would not approve property tax levies by the Lessees to pay the fixed annual lease rentals on the buildings as required in the Lease. In response, the Authority proposed to accomplish a "bond defeasance," that is, to terminate, release and discharge the lien and operation of the Indenture securing the bonds, including the Lease on the buildings. To assure that the Bondholders would receive their principal and interest when due, the Authority proposed to invest the Sinking Fund in government obligations held in a Trust Account to be established under a new "Escrow Agreement" with Old National Bank in Evansville as the paying agent and Escrow Trustee. The Authority describes this substitution of collateral arrangement as an "escrow to maturity." The Escrow Agreement would provide for the timely payment of principal and interest on the bonds according to the original bond schedule under the Indenture. Any funds accumulated in the Trust Account, including interest earned on the government obligations, not needed to pay the principal or interest on the bonds, would be deposited in the Authority's depreciation reserve account and used for repair and renovation of the buildings. Under this plan, after January 1, 1991, no further tax levy would be required for fixed rentals to pay the bonds, and the Authority would use the Trust Account to earn an estimated $9 Million in additional income from the difference between the interest paid on the bonds and interest earned from investing the moneys in the Trust Account.

To activate the Escrow Agreement, the authority requested the Trustee to execute a Release of Trust Indenture acknowledging that the obligations under the Indenture had been satisfied, terminated and discharged, thereby defeasing the bonds. The Release would have authorized the transfer of funds from the Sinking Fund for deposit with the Escrow Trustee, "in an amount at least equal to the principal of and interest to be paid on all outstanding bonds to maturity and sufficient to pay the principal of and interest on all outstanding bonds when due and payable."

In early 1991, after learning that the Trustee held sufficient funds in the Sinking Fund on deposit to redeem all the bonds, Hutchinson, Shockey, Erley & Co. surrendered $100,000 in bonds nominally due in 2005 to the Trustee for immediate redemption prior to maturity.

### Trial Court Disposition

Because of its concern whether the Indenture authorized the Authority's proposed bond defeasance and escrow to maturity plan, and confronted with conflicting demands from the Authority and Bondholders, the Trustee initiated this interpleader action seeking a declaratory judgment of its obligations under the Indenture. The Authority and the Bondholders filed answers to the Trustee's complaint. The Bondholders also filed counterclaims against the Trustee for breach of its fiduciary duty in wrongfully withholding funds available for redemption of the bonds, and filed cross-claims against the Authority, for demanding the Trustee's wrongful release and discharge of the Indenture securing the bonds while withholding funds from the Bondholders available to redeem the bonds. In these various pleadings the Bondholders denied the Trustee's authority to release and discharge the lien of the Indenture without providing for the immediate redemption of the bonds.

After discovery, including numerous depositions, extensive production of documents, and numerous hearings, on November 10, 1992, the trial court granted summary judgment for the Authority. The Bondholders appealed from that judgment.

### Court of Appeals Disposition

The Court of Appeals reversed the trial court, holding that the Bondholders were entitled to payment for their Bonds. *Hutchinson, Shockey,* 626 N.E.2d at 559. The

Court of Appeals based its decision on two separate lines of analysis.

First, it analyzed the language of the Indenture itself and concluded that there was no language

> in the Indenture to support the conclusion that *actual* payment and redemption upon surrender of the bonds, at or prior to maturity, can be postponed by an escrow once defeasance has occurred and the moneys are available on deposit with the Trustee for such payment. Such an arrangement would violate the pledge of security provisions and other affirmative covenants of the Authority found elsewhere in the Indenture.

*Id.* at 558.

Second, the Court of Appeals analyzed the County Building Authority Statute in effect in 1966, which provided that the maturities of municipal revenue bonds "shall not extend over a period longer than the period of the lease of the building or buildings on account of which said bonds are issued." Ind.Code Ann. § 26–2516 (Burns 1960) (enacted 1953 Ind.Acts, ch. 54, § 16) (current version at Ind.Code § 36–9–13–30 (1993)). The Court of Appeals concluded that this provision requires "that when the leases for the government buildings are terminated and, thus, the security for the bonds is released, the bonds must be eligible for redemption.... The Indenture as written does not provide for such an option, and neither can it lawfully be construed in that manner." *Id.* at 558–59.

Based on these two lines of reasoning, the Court of Appeals held that

> before the Authority can lawfully defease the bonds and implement its escrow to maturity plan, it is required to obtain the consent of the holders of two-thirds of the bonds to modify the Indenture. Absent such consent, the terms and covenants of the Indenture do not authorize the Authority to defease the bonds without also providing for immediate redemption. Thus, when the lien of the Indenture on the obligations which secure the bonds is terminated and released, the bonds are defeased, and the Bondholders are entitled to surrender and redeem their bonds, whether at or prior to maturity.

*Id.*

We disagree with the Court of Appeals in both respects.

### Analysis of Indenture Provisions

The parties have conflicting views of the meaning of the Indenture and so we construe its meaning. The primary purpose in the construction of contracts is to ascertain and give effect to the mutual intention of the parties. *Western & Southern Life Ins. Co. v. Vale* (1938), 213 Ind. 601, 610, 12 N.E.2d 350, 354. In the Indenture, the Authority made the following undertakings— "the pledge of security and affirmative covenants" referred to by the Court of Appeals— relevant to this dispute:

1. The Authority pledged all amounts paid to the Bond and Interest Sinking Fund and all rent and other income from the Authority's buildings to the Trustee to secure the payment of the principal and redemption price of and interest on the bonds. Indenture § 4.06.

2. The Authority promised that, except for changes expressly permitted by the Indenture, it would not agree to any modification of the terms of the Lease

> which would substantially impair or reduce the security of the holders of the bonds, or agree to the termination thereof, or agree to a reduction of the lease rental provided for therein until all indebtedness secured by this Indenture is fully paid, except upon compliance with the provisions of Section 12.02

Indenture § 7.01. Section 12.02 of the Indenture specified the Bondholder approval requirements for amendments to the Indenture.

3. The Authority agreed that it would not incur any indebtedness other than the Bonds payable from rents collected under the Lease other than short-term debt incurred in connection with the operation and maintenance of the Authority's buildings. Indenture § 7.07.

4. The Authority agreed that

until the bonds and the interest thereon shall have been paid, or provision for such payment shall have been made, and except as in this Indenture otherwise permitted, it will not sell, or otherwise dispose of or encumber, the [Authority's buildings], and will not create or permit to be created any charge or lien on the rentals or other income derived therefrom.

Indenture § 7.09.

In addition to these undertakings, the Indenture permitted the Authority, at its option and upon payment of a premium, to redeem certain outstanding Bonds according to procedures set forth in the Indenture. Indenture art. V. The Indenture contains no provisions giving the Bondholders the option to tender Bonds for redemption prior to maturity.

Finally, the Indenture contains the following defeasance provisions which we believe are far more central to this dispute than did the Court of Appeals:

Section 13.01. If the Authority shall pay or cause to be paid, or there shall otherwise be paid, to the holders of the bonds and coupons the principal and interest and redemption price, if any, to become due thereon, at the times and in the manner stipulated therein and in this Indenture, then the pledge of rentals and other income, moneys and securities hereby pledged, the right, title and interest of the Trustee, and all other rights granted hereby, shall thereupon cease, terminate and become void and be discharged and satisfied....

Section 13.02. Bonds or coupons for the payment or redemption of which money shall then be held by the Trustee or the Paying Agents (through the deposit by the Authority of funds for such payment or redemption, or otherwise), whether at or prior to the maturity or redemption date of such Bonds, shall be deemed to have been paid, within the meaning of Section 13.01; provided, however, that if any such Bonds are to be redeemed prior to the maturity thereof, the Authority shall have taken all action necessary to redeem such Bonds, and notice of such redemption shall have been duly given or provision satisfactory to the Trustee shall have been made for the giving of such notice; and provided further, that if the maturity or redemption date of any such bond shall not then have arrived, provision shall have been made by the Authority, by deposit with the Trustee or other method satisfactory to it, for the payment to the holders of any such Bonds and coupons, upon surrender thereof, whether or not prior to the maturity or redemption date thereof, of the full amount to which they would be entitled by way of principal, redemption price or interest to the date of such maturity or redemption; and provision shall have been made by the Authority, satisfactory to the Trustee, for the publication at least twice in an interval of not less than seven (7) days between publications in newspapers of general circulation or financial journals published in the Cities of Indianapolis, Indiana, and New York, New York, respectively, which notice shall advise the holder of the bonds and coupons that such moneys are so available for such payment.

Section 13.01 provides that if the Authority shall "pay," directly or indirectly, to the Bondholders all of the principal and interest due them, then the pledge of payments and rents and other undertakings made in the Indenture and the rights of the Trustee cease. Section 13.02 defines the term "pay" as used in § 13.01. It specifies that the Authority will be deemed to have paid Bonds not yet matured if (i) the Authority deposits with the Trustee the full amount to which the Bondholders, upon surrender of their Bonds, would be entitled to the date of maturity, and (ii) the Authority arranges for the publication of notice in Indianapolis and New York of notice to the Bondholders "that such moneys are so available for such payment."

Section 13.01, by its terms, eliminates the problem that the Court of Appeals found when it held that the covenants and amendment provisions of the Indenture prohibited defeasance without immediate redemption. Section 13.01 provides that if the defeasance provisions are complied with, "then the pledge of rentals and other income, moneys and securities hereby pledged, the right, title and interest of the Trustee, and all other

rights granted hereby, shall thereupon cease, terminate and become void and discharged and satisfied." Thus, by its terms, § 13.01 overrides the pledge of security and other affirmative covenants described above.

Concluding that the pledge of security and other affirmative covenants are subject to the defeasance provisions of § 13.01 does not adversely affect the Bondholders. Under the terms of the Indenture, the Indenture and all of the issuer's undertakings—pledge of payments and rents, covenants against further indebtedness and encumbrances—remain in effect so long as any Bonds or coupons remained outstanding unless and until payment is on deposit with the Trustee. Then, and only then, are the pledge of security and other affirmative covenants in the Indenture terminated. We conclude that there is nothing about the pledge of security or affirmative covenants that prevents defeasance so long as the provisions of § 13.01 are scrupulously complied with.

In reaching the contrary conclusion, that is, in determining that defeasance violated the pledge of security and affirmative covenants, the Court of Appeals went on to hold that the Bonds became immediately due and payable.[1] While we hold no violation of the pledge of security or affirmative covenants is triggered by the defeasance plan, the question of whether the Bondholders are entitled to pre-payment remains. The answer turns on the way § 13.02 is interpreted.

■ *Interpretation of § 13.02 Favorable to Bondholders.* Section 13.02 defines when Bonds are "deemed to have been paid, within the meaning of Section 13.01." That is, unless the provisions of § 13.02 are complied with, the defeasance provided for under § 13.01 cannot occur because the Bonds will not have been paid.

One of the conditions of Section 13.02 is that the Authority must make

provision ... by deposit with the Trustee or other method satisfactory to it, for the payment to the holders of any such bonds and coupons, *upon surrender thereof,*

*whether or not prior to the maturity ... date thereof,* of the full amount to which they would be entitled by way of principal ... or interest to the date of such maturity.

(Emphasis added). Further, in the notice provision, § 13.02 requires that the notice advise Bondholders and coupon holders "that such moneys are so available for such payment." The Bondholders argue that this language requires that Bondholders and coupon holders are to be paid the principal and interest to which they are entitled upon surrender of their securities, even if prior to maturity. This construction does no particular violence to Indiana bond law. It merely says that indentures will be interpreted in accordance with their terms and this particular Indenture provides for pre-payment in the event of defeasance.

*Interpretation of § 13.02 Favorable to Authority.* Traditional defeasance clauses existed for the purpose of permitting the issuer's and Trustee's obligations to be discharged even if all Bonds and coupons had not been tendered for payment. Bondholders were not entitled to receive payment for their securities prior to maturity. The Authority argues that while the Bondholders might tender their Bonds for payment prior to maturity, the language here does not create any entitlement to pre-payment. The proper construction of the "provision for payment" clause, according to the Authority, is that in order for defeasance to occur, the trustee must have an adequate amount on deposit to pay the Bonds and coupons at maturity, regardless of when the Bonds are surrendered for payment.

We agree with the Authority's interpretation. We note in particular that the language of § 13.02 provides that for the defeasance provisions to be effective, the Authority must make "provision ... for the payment to the holders ... of the full amount to which they would be entitled by way of principal ... or interest *to the date of such maturity,*" (emphasis added), not to the date the Bonds are tendered for payment. If Bondholders

---

**1.** It is unclear whether the Court of Appeals interpreted the Indenture to require that the Bondholders be paid as of the date of defeasance

or to permit the Bondholders to continue to hold their Bonds, collecting interest, until they tender their Bonds or until maturity.

and coupon holders could be paid upon surrender, then they would not be paid to the date of maturity. In other words, for the language of § 13.02 to support the Bondholders interpretation, the language would have to require that the Authority "make provision for the payment to the holders of the full amount to which they would be entitled by way of principal or interest *to the date of such surrender,*" not "to the date of such maturity."

While we think it likely that the defeasance provision of this Indenture was not drafted with the expectation that defeasance could take place fifteen years prior to final maturity, the Indenture also contains no restrictions that we can discern on such a result. The Indenture could have been drafted to require mandatory early redemption or early redemption at the option of the Bondholder. However, the fact that the Authority has been able to take advantage of a provision that was probably originally intended to serve a different purpose provides no basis for this court to re-write the contract and provide for early redemption. *See First Fed. Sav. Bank of Indiana v. Key Markets, Inc.* (1990), Ind., 559 N.E.2d 600, 604. The Bondholders will, under this arrangement, receive payment of principal and interest when due in accordance with the terms of their Bonds. And because provision has been made by the Authority, by deposit with the Trustee or other method satisfactory to it, of the full amount to which the Bondholders will be entitled by way of principal and interest to the date of maturity, further protection under the Indenture is not necessary and, by the terms of §§ 13.01 and 13.02, is terminated.

### Authorizing Statute

■ The Court of Appeals opinion also holds that any Bonds issued pursuant to the County Building Authority Statute, *supra,* must be redeemed as soon as sufficient funds are accumulated in the sinking fund. *Hutchinson; Shockey,* 626 N.E.2d at 559. This interpretation, of course, goes further than that court's interpretation of the Indenture, which gave the Bondholder the ability to redeem prior to maturity upon exercise of § 13.01, the defeasance clause.

■ We read the statute differently from the Court of Appeals. The provision in question sets forth a series of requirements for the *issuance* of bonds. That is, at the time bonds are issued, the maturities on the bonds must not exceed the term of the lease. We agree with the Authority that it is highly likely that this provision is meant to assure compliance with constitutional debt limitations and to protect bondholders. Once the bonds are issued and the bondholders are protected by the terms of the indenture, the statutory provision of necessity is overridden by the terms of the indenture. If we were to hold otherwise, it could work to the extreme prejudice on the bondholder or the issuer, depending on market conditions. For example, such a holding would allow units of government to override the maturity and redemption provisions of outstanding bonds and indentures in unfavorable interest rate environments, depriving bondholders of their high-rate securities. Government has no power to impair a contract in this way. *See Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819).

### Bondholders' Rights

At oral argument, counsel for Bondholders suggested that a ruling in the Authority's favor in this case would have an adverse impact on investors' confidence in Indiana municipal bonds. While it is the duty of the court to decide cases in accordance with the law, and we are convinced that the law is with the Authority here, this court is not blind to the impact that its rulings have on our state. Suffice it to say that this court has scrutinized this case with great care to assure itself that the Bondholders here got the benefit of the bargain they made when they invested in these securities. Convinced that the Bondholders have received every benefit for which they bargained, we are confident that investors will continue to place their trust in the high security of Indiana municipal bonds.

*Conclusion*

We therefore grant transfer, vacate the opinion of the Court of Appeals, and affirm the judgment of the Gibson Circuit Court. App.R. 11(B)(3).

SHEPARD, C.J., and DeBRULER and DICKSON, JJ., concur.

GIVAN, J., dissents—believes the Court of Appeals' opinion published at 626 N.E.2d 551 is correct.