## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 26 2019, 7:54 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Robert E. Saint
Emswiller, Williams, Noland & Clarke, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
CARMEL PHYSICIAN SURGERY
CENTER, LLC, CARMEL
AMBULATORY SURGERY
CENTER, LLC, AND WELDON
T. EGAN, M.D.

John D. Papageorge
Jeffrey D. Stemerick
Taft Stettinius & Hollister, LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEES
CARMEL AMBULATORY
SURGERY CENTER, LLC, AND
WELDON T. EGAN, M.D.
Craig W. Wiley
Jackson Lewis, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Michael N. Payne, M.D.,

*Appellant-Plaintiff,*

v.

Carmel Physician Surgery Center, LLC, Carmel Ambulatory Surgery Center, LLC, and Weldon T. Egan, M.D.,

*Appellees-Defendants.*

February 26, 2019

Court of Appeals Case No. 18A-CT-1391

Appeal from the Hamilton Superior Court

The Honorable Steven R. Nation, Judge

Trial Court Cause No. 29D01-1602-CT-1582

**Barteau, Senior Judge.**

# Statement of the Case

Michael N. Payne, M.D., appeals the trial court's grant of summary judgment to Carmel Physician Surgery Center, LLC, Carmel Ambulatory Surgery Center, LLC, and Weldon T. Egan, M.D. Payne also appeals the trial court's denial of his motion for summary judgment as to a counterclaim. We affirm in part, reverse in part, and remand.

# Issues

Payne raises eight issues, which we consolidate and restate as:

    I.    Whether the trial court erred in granting summary judgment to Carmel Physician Surgery Center, LLC, Carmel Ambulatory Surgery Center, LLC, and Weldon T. Egan, M.D. on Payne's claims of breach of contract.

II.   Whether the trial court erred in granting summary judgment to Carmel Ambulatory Surgery Center, LLC, and Weldon T. Egan, M.D. on Payne's claims of tortious interference with a contractual relationship.

III.   Whether the trial court erred in denying Payne's motion for summary judgment on Carmel Physician Surgery Center, LLC's counterclaim of constructive fraud.

# Facts and Procedural History

## I. The Parties

[3]   Michael N. Payne, M.D., and Weldon T. Egan, M.D., are board-certified anesthesiologists. Carmel Ambulatory Surgery Center, LLC (the Surgery Center), is an outpatient surgery center. The Surgery Center hosts a wide variety of procedures, from dental work to spinal surgery. Payne was a member of the Surgery Center's medical staff, and Egan is the Surgery Center's medical director. The Surgery Center is governed by bylaws, to which Payne and Egan were subject. We discuss the bylaws in more detail below, but for now we note the Surgery Center appoints doctors to the medical staff for two-year terms, subject to renewal upon reapplication.

[4]   The Surgery Center is owned in part by Carmel Physician Surgery Center, LLC (the Holding Company). The Holding Company is in turn owned by members, including Egan and (formerly) Payne. The Holding Company provides no services and derives its income from its ownership stake in the Surgery Center. The Holding Company pays profits to its members on a quarterly basis.

[5]     The Holding Company is governed by an operating agreement, to which Payne and Egan were parties. Among other provisions, the agreement establishes qualifications for membership in the Holding Company. The qualifications include not being retired, maintaining privileges at St. Vincent Hospital and Health Care Center, and working on a set number of cases at the Surgery Center in a twelve-month period. Appellant's App. Vol. 2, p. 161. Members are obligated to notify the Holding Company if they fail to meet any of the qualifications, and failure to meet any of the qualifications results in immediate termination of membership. *Id.* at 143, 161. If the Holding Company's board of managers questions a member's qualifications, "the Member shall bear the burden of producing information and proof of the Member's continuing qualification for membership in the [Holding Company.]" *Id.* at 161.

[6]     In addition, the operating agreement provides that a member "shall be deemed Permanently Disabled" when he or she has suffered a "medically determinable" condition that prevents the member from meeting the qualifications for membership, or if the board of managers "determines in good faith that the Member is or will be unable to safely utilize [the Surgery Center] for the performance of surgeries or procedures, with or without a reasonable accommodation, for a continuous period of not less than [120] calendar days, or a for a period of [180] days during a [12] month period." *Id.* at 164. "[A] Member that takes a lengthy leave of absence can be declared Permanently Disabled under this Policy." *Id.* A member who is deemed "Permanently

Disabled" may be required to sell his or her membership interest back to the Holding Company. *Id.* at 165.

[7] Payne and Egan were also members of Northside Anesthesia Services, LLC (NAS), a group of doctors that provides anesthesia services to hospitals and surgery centers. NAS does not have any patient facilities of its own. Instead, when Payne and Egan provided healthcare services at the Surgery Center, they acted as members of NAS and billed for their services through NAS.

[8] NAS is not a party to this case, but it plays a central role in the parties' dispute. Payne was subject to NAS's code of conduct, which obligates NAS's members to maintain a good state of health so that they can competently practice medicine. NAS's code of conduct requires members to self-report health conditions to NAS's Committee on Member Health (the Committee) if those conditions impact their ability to provide competent medical care. NAS's members are further required to report to the Committee concerns about any other member's competency. The Committee investigates reports that a member's competency to practice medicine is hindered by ill health.

[9] Finally, Payne had privileges to practice medicine at St. Vincent Carmel Hospital, which is near the Surgery Center. The Hospital grants privileges to physicians for fixed terms, subject to renewal. The Hospital is not a party to this case, but Payne's privileges at the hospital are relevant to the dispute.

## II. Events

[10] In 2009, Payne was diagnosed with Parkinson's Disease and multiple myeloma, a blood cancer. He reported his conditions to NAS's Committee and took a leave of absence while he sought treatment. Neither the Surgery Center nor the Holding Company objected to Payne's leave of absence or terminated their contractual relationships with Payne while he was off work for approximately ten months.

[11] In mid-2010, Payne informed the Committee that he was ready to return to work. After consulting with Payne and reviewing a letter from his neurologist, the Committee authorized Payne to return to practice on a part-time basis on July 31, 2010. The Committee instructed Payne to report if his medical conditions deteriorated or if he "is incapable of performing the duties of an anesthesiologist." Appellant's App. Vol. XII, p. 45.

[12] Payne returned to practice part-time at the Surgery Center while continuing to undergo treatment. Beginning in January 2010, Payne received disability benefits payments from one of his insurers because he was deemed to be partially disabled. He continued to receive partial disability payments through August 2013.

[13] Subsequently, several physicians and nurses at the Surgery Center told Egan they were concerned that Payne's medical conditions had rendered him incompetent to practice medicine. Among other concerns, they explained Payne had poor manual dexterity and had difficulty communicating. Egan

personally observed Payne at work and determined Payne had limited manual dexterity and had trouble speaking clearly, which hindered patient care. Payne later admitted that he was unable to effectively communicate during one urgent situation where a patient had trouble breathing, and a nurse summoned Egan to assist Payne in stabilizing the patient.

[14] On July 22 or 23, 2013, Egan orally reported his concerns about Payne's competence to the chairperson of NAS's Committee, Richard Steele, M.D. The Surgery Center had its own committee, the Quality Assurance Committee, which was charged with ensuring that the Center was providing competent care, but Egan preferred to approach NAS's Committee instead.

[15] On July 23, 2013, Egan and several other doctors talked with Payne about his medical conditions, and he agreed to take a medical leave of absence. Next, the Committee sent Payne a letter, dated July 24, 2013. The letter briefly described the allegations related to Payne's competency. The Committee further stated that Payne would not be allowed to return to work until he provided "documentation from [his] physician(s) addressing [his] overall health including [his] capability of delivering safe anesthetic care for patients. Appellant's App. Vol. XII, p. 47. Therefore, the Committee asked Payne to contact his doctors and "forward a letter to our committee stating their opinion that you are capable of returning to work including any restrictions they may feel are necessary." *Id.* at 48. Finally, the Committee instructed Payne to sign a contract titled, "Agreement for Physician Reentry," that set forth further

conditions for Payne to return to medical practice. *Id.*; Appellant's App. Vol. 7, p. 94. Payne signed the agreement on September 11, 2013.

[16] Payne continued to seek medical care while on leave. Neither the Surgery Center nor the Holding Company objected to the leave of absence or indicated his employment or membership was at risk. To the contrary, Payne continued to receive quarterly profit payments from the Holding Company during this period.

[17] After Payne began his leave of absence, he asked his disability insurers to provide additional coverage. He claimed in a January 19, 2014 email to an insurance company representative that he "has been disabled due to my illness" and had been unable to work since July 24, 2013. Appellant's App. Vol. XII, p. 165. On April 23, 2014, one of Payne's disability insurers notified him that his status was changed to "total disability," effective retroactively to July 25, 2013. *Id.* at 192. His subsequent payment statements from the insurer listed his disability status as "total." *See, e.g.*, Appellees' App. Vol. III, p. 55. Payne did not tell the Holding Company, the Surgery Center, or NAS that he was seeking additional payments for disability, or that an insurance company had deemed him to be totally disabled.

[18] Meanwhile, in 2013 Payne had applied to the Hospital to renew his hospital privileges, but the hospital decided to table Payne's application until the Committee determined he could return to practice. Payne's hospital privileges lapsed in January 2014, when his fixed term ended. In addition, Payne's two-

year appointment to the medical staff of the Surgery Center expired on January 26, 2014, at the end of the fixed term. Payne had provided information to the Surgery Center as part of reapplying for appointment to the medical staff. The Surgery Center decided to delay a decision on Payne's reappointment pending his return to work.

[19] During Payne's leave of absence, he told Egan and other members of the Holding Company that he was healthy and planned to return to work. However, during a September 2013 meeting between Payne and Egan, Egan left Payne with a clear impression that Egan did not want Payne to return to work due to Egan's perceptions of Payne's limitations. Appellant's App. Vol. VI, p. 81.

[20] The Committee had instructed Egan to provide a written document explaining his original concerns about Payne's competence. Egan provided a letter to the Committee on February 25, 2014. In the letter, Egan described reports from doctors and nurses at the Surgery Center about Payne's inability to competently manage patients, as well as his own observations of Payne's poor manual dexterity and inability to communicate clearly, to the detriment of patients under Payne's care.

[21] On March 7, 2014, Payne applied for reappointment to the Surgery Center's medical staff. In addition, on March 12, 2014, Payne petitioned the Committee to allow him to return to practice, providing statements from his physicians. The Committee met with Payne on March 19, 2014 and determined more

information was required. The Committee continued to investigate Payne's competence, asking doctors and nurses at the Surgery Center to provide additional information. The Holding Company did not provide any information to the Committee. Meanwhile, the Committee and Payne agreed that he would submit to an independent medical examination.

[22] Payne submitted to an independent medical examination in May 2014. The evaluation team cited Payne's continuing challenges in motor functions and speech, and concluded that it could not "endorse [his] return to the clinical practice of anesthesiology at this time." Appellant's App. Vol. XII, p. 100. As a result, on July 21, 2014, the Committee informed Payne it would not allow him to resume practicing medicine through NAS. In a July 22, 2014 memo to Payne, the Committee stated Payne could reapply to return to work, but he would have to provide "assurances from a competency assessment organization as well as a recommendation from a nationally accredited residency program suggesting that you may safely provide anesthesia care for patients." *Id.* at 105.

[23] On July 29, 2014, the Holding Company's board of managers met. The meeting minutes show the board "ratified the purchase of Dr. Payne's units in the month of June." Appellant's App. Vol. VII, p. 170. The purchase effectively terminated Payne's membership in the Holding Company. The president of the board, J. Scott Pittman, M.D., explained that the board terminated Payne's membership because Payne had failed to work on the required amount of cases in a twelve-month period. The Holding Company stopped paying quarterly profit distributions to him as of July 29, 2014.

# III. Trial Court Proceedings

On February 23, 2016, Payne filed a civil complaint against Egan, the Surgery Center, and the Holding Company. He later amended his complaint. In summary, Payne claimed Egan and the Surgery Center tortiously interfered in his contractual relationship with the Holding Company. He requested that Egan and the Surgery Center be ordered to pay punitive damages. Payne further claimed Egan, the Surgery Center, and the Holding Company breached the terms of their contracts with him. In addition, he claimed the Holding Company breached a fiduciary duty to him.

The defendants filed answers, in which they raised various affirmative defenses. In addition, the Holding Company filed counterclaims. Specifically, the Holding Company alleged Payne (1) breached his contract with the Holding Company, and (2) committed constructive fraud against the Holding Company.

The Surgery Center and Egan filed a motion for summary judgment, followed by the Holding Company's separate motion for summary judgment. Next, Payne filed a motion for partial summary judgment against the Surgery Center and Egan as to his claim for breach of contract. He filed a separate motion for summary judgment against the Surgery Center and Egan as to their defenses. Finally, Payne filed a separate motion for summary judgment against the Holding Company as to its defenses and counterclaims. Each of the parties filed responses to the various motions, and the court held oral argument.

[27] On June 6, 2018, the court issued findings and conclusions granting summary judgment to the Surgery Center and Egan on Payne's claims for breach of contract and tortious interference with a contractual relationship. The court also denied Payne's motion for partial summary judgment on Egan and the Surgery Center's defenses. The court concluded there "is no just reason for delay" and ordered the entry of a "full, complete, and final" judgment. Appellant's App. Vol. II, p. 94.

[28] On June 8, 2018, the trial court issued an order granting summary judgment to the Holding Company on Payne's claims for breach of contract and breach of fiduciary duty. In addition, the court denied Payne and the Holding Company's respective motions for summary judgment on the Holding Company's counterclaims of breach of contract and constructive fraud.

[29] Payne filed a Notice of Appeal as to the June 6 order and asked the trial court to certify its June 8 order for interlocutory appeal. The trial court granted his request. Next, Payne asked this Court to accept jurisdiction over the June 8 order. This Court accepted jurisdiction and consolidated the appeal with Payne's appeal of the June 6 order. We discuss additional facts below as needed.

# Discussion and Decision

## I. Standard of Review

[30] Summary judgment is proper if the evidence designated by the parties "shows that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law." Indiana Trial Rule 56(C). "The initial burden is on the summary judgment movant to 'demonstrate [ ] the absence of any genuine issue of fact as to a determinative issue,' at which point the burden shifts to the non-movant to 'come forward with contrary evidence' showing an issue for the trier of fact." *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014) (quoting *Williams v. Tharp*, 914 N.E.2d 756, 761-62 (Ind. 2009)).

[31] We review a summary judgment decision de novo, applying the same standard as the trial court. *Miller v. Danz*, 36 N.E.3d 455, 456 (Ind. 2015). We may affirm a grant of summary judgment upon any theory supported by the evidence. *Id.* On appeal, we construe all facts and reasonable inferences drawn from those facts in a light most favorable to the nonmoving party. *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 592 (Ind. 2001).

[32] The nonmoving party has the burden on appeal of proving the grant of summary judgment was erroneous, but we carefully review the trial court's decision to ensure the party was not improperly denied a day in court. *McSwane v. Bloomington Hosp. & Healthcare Sys.*, 916 N.E.2d 906, 909-10 (Ind. 2009) (quotation omitted). The fact that the parties have filed cross-motions for summary judgment does not alter our standard for review, as we consider each

motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Reed v. Reid*, 980 N.E.2d 277, 285 (Ind. 2012).[1]

## II. Breach of Contract

[33] Payne argues the trial court erred in granting summary judgment to Egan, the Surgery Center, and the Holding Company on his claims of breach of contract. To prevail on a claim for breach of contract, a plaintiff must prove the existence of a contract, a breach of that contract by a defendant, and damages resulting from the breach. *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012). The breach must be a cause in fact of the complainant's loss. *WESCO Distribution, Inc. v. ArcelorMittal Ind. Harbor, LLC*, 23 N.E.3d 682, 695 (Ind. Ct. App. 2014), *trans. dismissed*.

[34] Generally, the construction of a written contract is a question of law for which summary judgment is particularly appropriate. *Orthodontic Affiliates, P.C., v. Long*, 841 N.E.2d 219, 222 (Ind. Ct. App. 2006). When we review contract cases, our primary goal is "to ascertain and give effect to the mutual intention of the parties." *Hutchinson, Shockey, Erley & Co. v. Evansville-Vanderburgh Cty. Bldg. Auth.*, 644 N.E.2d 1228, 1231 (Ind. 1994).

---

[1] Payne claims the trial court's findings and conclusions should carry less weight because the court largely adopted the defendants' proposed findings and conclusions. The court did not adopt the proposed findings and conclusions verbatim, because the court denied in part both sides' summary judgment motions. In the absence of verbatim adoption of proposed findings and conclusions, we retain our confidence "that the findings are the result of considered judgment by the trial court." *Safety Nat'l Cas. Co. v. Cinergy Corp.*, 829 N.E.2d 986, 993 n.6 (Ind. Ct. App. 2005), *trans. denied*.

If the terms of a contract are clear and unambiguous, we apply the plain and ordinary meaning of the language. *Wright v. Am. States Ins. Co.*, 765 N.E.2d 690, 693 (Ind. Ct. App. 2002). By contrast, if the terms of a contract are ambiguous, it is the responsibility of the trier of fact to ascertain the facts necessary to construe the contract. *Orthodontic Affiliates*, 841 N.E.2d at 222. Consequently, when summary judgment is granted based upon the construction of a written contract, the trial court has either determined as a matter of law that the contract is not ambiguous or uncertain, or that any ambiguity can be resolved without the aid of a factual determination. *Id.*

## A. Egan and the Surgery Center

Payne argues that Egan and the Surgery Center (through its agent, Egan) violated the Surgery Center's bylaws, specifically its confidentiality provisions, when Egan disclosed concerns about Payne's health to NAS's Committee. Payne further claims he was damaged by the disclosure of confidential information because it led to his leave of absence and, later, the termination of his membership in the Holding Company. Egan and the Surgery Center respond that the disclosures were permissible under the bylaws and governing statutes.

In the preamble to the Surgery Center's bylaws, the Surgery Center identifies itself as a "professional review [body]" and a "peer review [committee]" as defined by Indiana statutes. Appellant's App. Vol. II, p. 183. The bylaws establish several committees, including the Quality Assurance Committee, which is charged with "reviewing, evaluating, and maintaining the quality and

efficiency of patient care." *Id.* at 206. Article XIII of the bylaws governs confidentiality as follows:

Section A. Definition of Representative

For purposes of this Article, the term 'representative' includes the governing body, its directors and committees; the Executive Director; the medical staff organization and medical staff members, and committees which have responsibility for collecting and evaluating credentials, acting upon applications for appointment or reappointment; and any authorized representatives of the foregoing.

Section B. Confidentiality of Information

Information with respect to any practitioner submitted, collected, or prepared by any representative, or any other health care facility or organization or medical staff for the purpose of achieving and maintaining quality patient care, reducing morbidity and mortality, or contributing to clinical research shall, to the fullest extent permitted by law, be confidential and shall not be disseminated to anyone other than a Center representative, not used in any way except as provided herein or except as otherwise required by law. Such confidentiality shall also extend to information of like kind that may be provided by third parties. This information shall not become part of any particular patient's file or of the general Center records.

Section C. Immunity from Liability

1. No Center representative shall be liable to an applicant for damages or other relief for any action taken or statement or recommendation made within the scope of his/her duties if such person acts in good faith and without malice.

2. No Center representative shall be liable to a practitioner for damages or other relief by reason of providing information, including otherwise privileged or confidential information, to any other Center representative or to any other health care facility or organization of health professionals concerning a practitioner who did or does exercise clinical privileges at this Center, provided that such Center representative acts in good faith and without malice. No information concerning a practitioner shall be furnished to other health care facilities or organizations without the consent of the practitioner unless the furnishing of such information is required by law.

Section D.  Activities and Information Covered

1. The confidentiality and immunity provided by this Article shall apply to all acts, communications, reports, recommendations or disclosures performed or made in connection with Center activities concerning, but not limited to:

a. applications for appointment, clinical privileges, or specified services;

b. periodic reappraisals for reappointment, clinical privileges or specified services;

c. corrective action;

d. patient care evaluations;

e. utilization review;

f.  other Center, department, committee or staff activities related to monitoring and maintaining quality patient care and appropriate professional conduct.

2.  The acts, communications, reports, recommendations, disclosures and other information referred to in this Article may relate to a practitioner's professional qualifications, clinical ability, judgment, character, physical and mental health, emotional stability, professional ethics, or any other matter that might directly or indirectly affect patient care.

Section E.  Cumulative Effect

Provisions in these by-laws and in application forms relating to authorizations, confidentiality of information and immunities from liability shall be in addition to other protection provided by law and not in limitation thereof, and in the event of conflict, the applicable law shall be controlling.

*Id.* at 209-11.

[38]  The parties agree that Payne, Egan, and the Surgery Center's officers are subject to the bylaws, and that the bylaws are a contract.  Further, there is no dispute that Egan, who served as the Surgery Center's medical director, disclosed

confidential information about Payne's physical health to NAS's Committee, an outside organization of health care professionals, without Payne's consent.[2]

[39] The trial court determined, and Egan and the Surgery Center claim on appeal, that they cannot be held liable because Egan's disclosure to the Committee was required by law per Article XIII, Section C.2. of the bylaws. They cite to a provision of the Indiana Administrative Code, which states, in relevant part:

> A practitioner who has personal knowledge based upon a reasonable belief that another practitioner holding the same licenses has engaged in illegal, unlawful, incompetent, or fraudulent conduct in the practice of medicine or osteopathic medicine shall promptly report such conduct to a peer review or similar body, as defined in IC 34-6-2-99, having jurisdiction over the offending practitioner and the matter.

844 IAC 5-2-8(a) (2017).

[40] There are two flaws in Egan and the Surgery Center's argument. First, there is a dispute of material fact as to whether Egan had a reasonable belief that Payne was incompetent to practice medicine. Payne submitted evidence to the trial court, in the form of his deposition, in which he disagreed that his medical conditions posed a threat to his patients' well-being. In addition, Payne argued

---

[2] Doctors and nurses employed at the Surgery Center separately discussed their concerns about Payne's competency with NAS's Committee in 2014. The trial court determined those discussions were not an actionable breach of the bylaws, and Payne does not challenge that ruling on appeal.

to the trial court that there is a "factual dispute" as to whether Egan acted in good faith and without malice. Tr. Vol. 2, p. 103.[3]

[41] The trial court acknowledged in its findings and conclusions that the parties disagreed as to whether Egan lied to the Committee in his oral report in July 2014 and again via letter in February 2014. The trial court specifically found: "The facts regarding malice are in dispute." Appellant's App. Vol. II, p. 77. The court further found, "there are questions of fact over whether the information provided to the Healthy Member Committee was false and the person providing it knew it was false." *Id.* at 87. Under these disputed facts, we cannot conclusively determine at the summary judgment stage that Egan had a reasonable belief in Payne's incompetency for purposes of 844 IAC 5-2-8(a).

[42] Second, even if Egan had a reasonable belief as to Payne's incompetency, 844 IAC 5-2-8(a) merely requires disclosure to a peer review committee. The Surgery Center had its own peer review committee, the Quality Assurance Committee, to whom Egan could have presented his concerns about Payne without violating the bylaws' confidentiality requirements. In other words,

---

[3] Payne stated in a summary judgment brief, "Once Dr. Egan and [the Surgery Center] had personal knowledge of the complaints regarding Dr. Payne's competency, they were duty bound to report the information to the [Surgery Center's] Quality Assurance Committee." Appellant's App. Vol. IX, p. 62. Egan and the Surgery Center read that sentence as a binding concession by Payne that Egan acted in good faith and with a reasonable belief in Payne's incompetence. We disagree, due to Payne's arguments during the trial court's hearing, which put the trial court and opposing parties on notice that Payne did not concede Egan acted in good faith.

Egan could have fulfilled his perceived duties under 844 IAC 5-2-8(a) without approaching NAS's Committee, so his disclosure to the Committee was not required by law for purposes of the bylaws.

[43]     In any event, it is also true that the plain language of Article XIII, section C.2., requires Egan to demonstrate that he acted in good faith and with an absence of malice to avoid liability for disclosing confidential information to an outside health care facility or organization of health professionals. The trial court determined there is a dispute of material fact as to whether Egan made his disclosures to the Committee in good faith. As a result, there are disputes of material fact as to whether Egan (and, by extension, the Surgery Center) breached the confidentiality provisions of the bylaws.

[44]     The parties and the trial court also addressed whether Egan's disclosures to the Committee were permissible under Article VI of the bylaws. That article governs procedures for the appointment and reappointment of doctors to the Surgery Center's medical staff. The article provides, in relevant part, that an applicant seeking appointment or reappointment to the Surgery Center "authorizes Center representatives to consult with others who have been associated with him and/or who may have information bearing on his/her competence and qualifications." Appellant's App. Vol. V, p. 61. Furthermore, an applicant:

> authorizes and consents to Center representatives providing other hospitals, medical associations, licensing board, other health care facilities or organization of health professions with any

> information relevant to such matters that the Center may have
> concerning him, and releases Center representatives from liability
> for so doing, provided that such furnishing of information is done
> in good faith and without malice.

*Id.*

[45] The trial court determined that Egan's February 25, 2014 letter to NAS's Committee was permissible under Article VI, and thus did not violate the confidentiality requirements of Article XIII, because Payne had taken steps to reapply for appointment to the Surgery Center's medical staff at that time. Regardless, there are disputes of material fact as to whether Egan acted in "good faith and without malice." For that reason, Egan and the Surgery Center are not entitled to summary judgment under Article VI.[4]

[46] In summary, the trial court erred in granting summary judgment in favor of Egan and the Surgery Center as to Payne's claim of breach of contract. The

---

[4] On a related note, the "Agreement for Physician Reentry" that Payne and the Committee executed on September 11, 2013, discusses the sharing of information about Payne among the various corporate entities at issue here. Specifically, the Agreement provides:

> Both parties agree that [the Committee] may solicit, receive and transmit information
> from and to other agencies charged with monitoring [Payne's] recovery. This
> Coordination will specifically serve as a release of information to permit [the Committee]
> and other monitoring agencies to share information about [Payne's] recovery program
> without violating their separate agreements with [Payne].

Appellant's App. Vol. XII, p. 50. Neither the parties nor the trial court address how this provision applies to Egan and the Surgery Center's confidentiality obligations under the Surgery Center's bylaws, so we will not address it either. *See Young v. Butts*, 685 N.E.2d 147, 151 (Ind. Ct. App. 1997) (stating the Court will not "make up its own arguments" on appeal). However, the provision may be relevant during proceedings on remand.

merits of the claim must be resolved by a finder of fact. We need not address Payne's other arguments on this issue.

### *B. Holding Company*

[47] Payne's breach of contract claim against the Holding Company is based on his belief that the Company violated an "implied duty not to hinder, delay, or prevent" him from carrying out his duties under the Holding Company's operating agreement. Appellant's Br. p. 38. Specifically, he claims Egan, as an agent of the Holding Company, unfairly hindered him from returning to work through communications with NAS's Committee, which resulted in the Holding Company terminating Payne's membership. In response, the Holding Company argues an implied duty to not hinder contractual performance is invalid in Indiana.

[48] We find guidance in the Indiana Supreme Court's decision in *First Fed. Sav. Bank of Ind. v. Key Mkts., Inc.*, 559 N.E.2d 600 (Ind. 1990). In that case, First Federal owned a shopping center, and Key Markets owned a one-acre tract within the shopping center. Key Markets also leased a portion of First Federal's land, which was used for a parking lot. Under the lease agreement, Key Markets could not assign its interest in the leased land without First Federal's consent. Key Markets sought to sell the one-acre tract and asked First Federal to consent to an assignment of the lease for the parking lot. First Federal refused, which hindered Key Market's sale. Key Markets sued.

The trial court concluded First Federal "had a legal duty not to unreasonably withhold consent" and had violated that duty. *Id.* at 602. A panel of this Court affirmed, similarly concluding the landlord had violated its implied duty not to unreasonably withhold consent.

The Indiana Supreme Court reversed. The Court noted that when the language of a contract is unambiguous, it should be enforced according to its terms. When the language is ambiguous, "in limited and particular cases the court may be required to presume the parties were acting reasonably and in good faith to discern the intention of the parties and resolve the ambiguity or uncertainty." *Id.* at 604. In general, "it is not the province of courts to require a party acting pursuant to such a contract to be 'reasonable,' 'fair,' or show 'good faith' cooperation. *Id.* The Supreme Court concluded the terms of the contract at issue were clear and well understood by the parties, and the trial court "erred in applying improper standards in its interpretation of the contract." *Id.* at 606. The trial court erred in adding a reasonableness requirement.

The Court of Appeals has applied the holding in *First Federal* to a variety of contractual contexts. In *Old Nat'l Bank v. Kelly*, 31 N.E.3d 522, 531 (Ind. Ct. App. 2015), *trans. denied*, a panel of this Court stated in a bank-depositor dispute: "Indiana law does not impose a generalized duty of good faith and fair dealing on every contract; the recognition of an implied covenant is generally limited to employment contracts and insurance contracts." *See also Hispanic College Fund, Inc. v. Nat'l Collegiate Athletic Ass'n*, 826 N.E.2d 652, 658 (Ind. Ct. App. 2005) (dispute involving voluntary membership association and member

of association; Court determined "Indiana law does not impose a generalized duty of good faith and fair dealing on every contract"), *trans. denied*; *Allison v. Union Hosp., Inc.*, 883 N.E.2d 113, 123 (Ind. Ct. App. 2008) (lawsuit between nurse anesthetists and hospital for breach of contract; an implied duty of fair dealing is recognized "generally only in limited circumstances," when a "contract is ambiguous or expressly imposes such a duty on the parties").

[52] In the current case, Payne does not identify any specific provisions of the operating agreement that are subject to an implicit duty to not hinder performance. He further fails to identify any contractual ambiguities pursuant to which such a duty could be found to apply. Following the holding in *First Federal*, we conclude that a general duty not to hinder the performance of a contract is inapplicable here.

[53] Payne cites *Lesh v. Trs. of Purdue Univ.*, 124 Ind. App. 422, 116 N.E.2d 117 (1953), for the proposition that every contract contains an implied condition that neither party will hinder the other in the discharge of contractual obligations. We are obligated to follow the Indiana Supreme Court's more recent holding in *First Federal*, in which the Court stated trial courts generally should not read into contracts a requirement that parties cooperate in good faith in the performance of contractual duties or rights. Payne also cites *Levee v. Beeching*, 729 N.E.2d 215 (Ind. Ct. App. 2000), in support of his claim, but that case is distinguishable because it dealt with a claim of tortious interference with a contractual relationship rather than a claim of breach of contract.

We conclude the trial court did not err in granting summary judgment in favor of the Holding Company on Payne's claim for breach of contract. We need not address the Holding Company's other arguments on this issue.

## III. Tortious Interference with a Contractual Relationship

Payne argues the trial court erred in granting summary judgment to Egan and the Surgery Center on his claim of tortious interference with a contractual relationship, specifically the Holding Company's operating agreement. Egan and the Surgery Center contend Payne's claim was untimely, and, in the alternative, that Egan cannot be held liable because he was also a party to the Holding Company's operating agreement.

The tort of interference with a contractual relationship is based on "the public policy that contract rights are property, and under proper circumstances, are entitled to enforcement and protection from those who tortiously interfere with those rights." *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1234 (Ind. 1994). The five elements of tortious interference with a contractual relationship are: (1) the existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of the breach of the contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach. *Bilimoria Compu. Sys., LLC v. Am. Online, Inc.*, 829 N.E.2d 150, 156 (Ind. Ct. App. 2005). A legitimate reason for the defendant's actions provides the necessary justification to avoid liability. *Bragg v. City of Muncie*, 930 N.E.2d 1144, 1148 (Ind. Ct. App. 2010).

[57] The typical claim for tortious interference with a contractual relationship involves a third party intervening in a two-party contract and improperly inducing a breach. *See, e.g.*, *id.* at 1147 (appellant developer claimed city officials improperly intervened in his contract with the manager of a housing authority). Payne's claim is more indirect. He contends Egan and the Surgery Center (through its agent, Egan) made false statements to NAS's Committee about Payne's competence to practice medicine, which caused Payne to be placed on leave and rendered unable to practice medicine. Payne further claims his inability to practice medicine caused the Holding Company to terminate Payne's membership under the Company's operating agreement because he did not work on a required number of cases in a twelve-month period. He thus concludes Egan and the Surgery Center interfered with his contractual relationship with the Holding Company.

[58] Egan and the Surgery Center produced evidence that Egan orally reported to the Committee in July 2013, and sent a letter to the Committee in February 2014, expressing a good-faith belief that Payne was not competent to practice medicine. Under our summary judgment standard, Payne was obligated to produce contradictory evidence of Egan's specific intent to improperly induce the Holding Company to terminate Payne's membership.

[59] It is undisputed that in September 2013, Egan told Payne that he thought Payne was incompetent to practice medicine and indicated that he did not want Payne to resume practicing medicine. Nevertheless, there is no evidence that Egan directly contacted the Holding Company's board of managers about Payne's

medical conditions before or during his leave of absence, much less encouraged them to terminate his membership. As a result, Payne argues Egan indirectly sought Payne's termination from the Holding Company by ensuring Payne did not return from his leave of absence.

[60] The facts, even when viewed in the light most favorable to Payne, provide no support for the claim that Egan intended to indirectly seek Payne's termination from the Holding Company. It is undisputed that Payne had taken a leave of absence through NAS's Committee from late 2008 through the end of July 2010, a span of around ten months. The Holding Company did not object to Payne's inability to perform the required number of procedures during his leave. To the contrary, Payne resumed his medical practice in August 2010 with no impact on his membership in the Holding Company.

[61] When Payne agreed to a second indefinite leave of absence in July 2013 through NAS's Committee, the Holding Company did not object or indicate that his membership was at risk. To the contrary, the president of the Holding Company, J. Scott Pittman, M.D., was supportive of Payne and met with Egan to "figure out what we could do to get [Payne] back [to work]." Appellees' App. Vol. 2, p. 55. Another Holding Company board member, Robert Czarkowski, M.D., indicated all board members wanted Payne "to get healthy to come back to practice." *Id.* at 95. They believed he could return to practice because "[h]e did it once, we assumed he could have it happen a second time." *Id.* Payne's privileges at St. Vincent Hospital lapsed in January 2014, which disqualified Payne from membership in the Holding Company at that time, but

the Holding Company took no action.  Finally, during Payne's leave of absence, the Holding Company continued to pay Payne his quarterly share of the profits until terminating his membership on July 31, 2014.

[62] Based on this undisputed evidence, even though Payne technically no longer qualified for membership in the Holding Company due to a lack of hospital privileges and failure to perform the required number of procedures in a twelve-month period, there was no reason for Egan to believe that the Holding Company would terminate Payne's membership while Payne was on leave. Instead, all evidence indicated the Holding Company would wait for Payne to return from his 2013 leave of absence, just as it had done during Payne's previous leave of absence.

[63] Payne's theory that Egan intended to interfere with Payne's membership in the Holding Company by seeking to have Payne put on an extended leave of absence through NAS's Committee is too tenuous and is unsupported by evidence.  As a result, Payne failed to establish a dispute of fact about Egan's intent to interfere with Payne's contractual relationship with the Holding Company, and his claim must fail.

[64] Payne's claim that the Surgery Center committed tortious interference with a contractual relationship is based entirely on his theory that Egan acted as the Center's agent.  Because Payne's claim against Egan fails, his claim against the Surgery Center must also fail.  We conclude the trial court did not err in granting summary judgment in favor of Egan and the Surgery Center on this

claim. It is unnecessary for us to address Egan and the Surgery Center's other arguments in this issue.

## IV. Counterclaim: Constructive Fraud

[65] Payne argues the trial court should have granted his motion for summary judgment on the Holding Company's counterclaim of constructive fraud. The trial court denied both parties' motions for summary judgment on this counterclaim, determining there were questions "of fact as to if and when Payne did disclose his disability to [the Holding Company] and remained silent when he had a duty to speak." [5] Appellant's App. Vol. 2, p. 108.

[66] "Constructive fraud is the breach of a legal or equitable duty which is fraudulent as a result of its tendency to deceive others, to violate a public or private trust, or to injure the public interests." *Comfax Corp. v. N. Am. Van Lines, Inc.*, 587 N.E.2d 118, 125 (Ind. Ct. App. 1992). "Constructive fraud arises by operation of law when there is a course of conduct which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the actual intent to defraud." *Biberstine v. N.Y. Blower Co.*, 625 N.E.2d 1308, 1315 (Ind. Ct. App. 1993), *trans. dismissed*.

---

[5] Payne is not appealing the trial court's denial of his motion for summary judgment as to the Holding Company's counterclaim for breach of contract. Further, the Holding Company is not cross-appealing the denial of its motion for summary judgment on its counterclaims.

[67] The elements of constructive fraud are 1) a duty existing due to the relationship between the parties, 2) representations or omissions made in violation of that duty, 3) reliance thereon by the complaining party, 4) injury to the complaining party as a proximate result thereof, and 5) the gaining of an advantage by the party to be charged at the expense of the complaining party. *Dawson v. Hummer*, 649 N.E.2d 653, 661 (Ind. Ct. App. 1995).

[68] Constructive fraud does not require that intent be proven because the parties are not dealing with each other at arm's length. *Comfax Corp.*, 587 N.E.2d at 125. Instead, the law infers fraud from the relationship between the parties. *Id.* A member of a closely held corporation has a fiduciary duty "to deal fairly, honestly, and openly with [the] corporation and fellow stockholders and must not be distracted from the performance of [ ] official duties by personal interests." *Rapkin Grp. v. Cardinal Ventures, Inc.,* 29 N.E.3d 752, 757 (Ind. Ct. App. 2015), *trans. denied*.

[69] The Holding Company's counterclaim for constructive fraud was based on the following theory: (1) Payne was a fiduciary of the LLC; (2) during Payne's second leave of absence, he knew he was disabled to the point of being permanently unable to practice medicine but hid that fact from the Holding Company; (3) the Holding Company relied on Payne's silence about his disability and continued his membership in the company; (4) the Holding Company lost money in the form of inappropriate quarterly profit distributions to Payne; and (5) Payne received $463,872.14 from the Holding Company in unearned distributions from the time he went on leave until the Holding

Company terminated his membership on July 31, 2014. Appellant's App. Vol. IV, pp. 104-05.

[70] Payne argues there is no evidence that the Holding Company relied upon his silence about his medical condition. He instead claims the Holding Company, through its agent Egan, understood he was medically incompetent and would not return to the practice of medicine after taking a leave of absence in July 2013.

[71] Whether reliance was justified is a matter for the jury to determine if there is conflicting evidence. *Biberstine*, 625 N.E.2d at 1316. In this case, the operating agreement between Payne and the Holding Company obligated Payne to inform the Holding Company if he became too medically infirm to competently practice medicine. Payne never notified the Holding Company his conditions rendered him incompetent. To the contrary, prior to going on medical leave, when Payne was asked how he was managing working with his health conditions, he said he "was doing well." Appellant's App. Vol. VII, p. 55.

[72] To be sure, Egan believed Payne was incompetent to practice medicine and shared that belief with Payne in September 2013, after Payne went on leave. Even so, Payne continued to tell officers at the Holding Company that he was seeking treatment, was getting better, and intended to return to the practice of medicine. After he went on leave, he met with Pittman, the Holding Company's chairperson. Payne told Pittman "he thought he would be able to eventually [resume practicing medicine]." Appellant's App. Vol. X, p. 142. As

late as June 2014, Payne sent a letter to Pittman stating that he was physically able to return to work and hoped to resume the practice of medicine.

[73] In addition, Payne took steps to renew his appointment to the medical staff at the Surgery Center. On March 12, 2014, he asked NAS's Committee to allow him to return to the practice of medicine, providing information from his doctors. Prior to that date, Payne did not provide the Holding Company with any information directly from his doctors.

[74] The Holding Company was willing to give Payne a chance to prove he could return to the practice of medicine. Robert Czarkowski, M.D., a member of the Holding Company's board of managers, explained that the Holding Company's board intended "for [Payne] to get healthy to come back to practice." Appellant's App. Vol. VII, p. 40.

[75] Meanwhile, despite assuring the Holding Company that he was ready and able to return to work, Payne asked his disability insurer to increase his payments after he began his leave of absence on July 24, 2013. He had already been receiving disability payments for partial disability, but he insisted he had become completely disabled. Payne claimed in a January 19, 2014 email to an insurer that he "has been disabled due to my illness" and had been unable to work since July 24, 2013. Appellees' App. Vol. V, p. 10. On April 23, 2014, one of his disability insurers notified him that his status was changed to "total disability," effective retroactively to July 25, 2013. Appellees' App. Vol. III, p. 52. Payne received a payment from his insurer to account for the retroactive

increase in payments. His subsequent payment statements from the insurer listed his disability status as "total." *See, e.g.*, *id.* at 55. Payne did not tell the Holding Company, the Surgery Center, or NAS that he was seeking additional payments for disability.

[76] The foregoing evidence is enough to establish a dispute of material fact as to whether the Holding Company reasonably relied on Payne's silence about his disability and his representations that he was able to return to work while they continued to pay him quarterly profit dividends. The trial court did not err in denying Payne's motion for summary judgment as to the Holding Company's counterclaim for constructive fraud.

## Conclusion

[77] For the reasons stated above, we affirm the trial court's grant of summary judgment to the Holding Company on Payne's claim of breach of contract. We further affirm the trial court's grant of summary judgment to Egan and the Surgery Center on Payne's claim of tortious interference with a contractual relationship. In addition, we affirm the trial court's denial of Payne's motion for summary judgment on the Holding Company's counterclaim of constructive fraud. We reverse the trial court's grant of summary judgment to Egan and the Surgery Center on Payne's claim for breach of contract. We remand for further proceedings.

[78] Affirmed in part, reversed in part, and remanded.

Mathias, J., and Crone, J., concur.